**UNITED STATES of America**

v.

**Wong Chi KEUNG, a/k/a "Steven Wong," a/k/a "Lo Fu Chai," a/k/a "Tiger Boy" and Tsoi Hi Lung, Defendants.**

**No. 88 Cr. 571 (MBM).**

United States District Court, S.D. New York.

March 26, 1991.

Howard Shapiro, Asst. U.S. Atty., New York City, for U.S.

Robert A. Schutzman, Forest Hills, N.Y., for defendants.

OPINION AND ORDER

MUKASEY, District Judge.

Wong Chi Keung was convicted by a jury on charges that he conspired to possess with intent to distribute more than 20 kilograms of a substance containing a detectable amount of heroin, and did possess more than a kilogram of such a substance, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C) and 846. The Court of Appeals then vacated the conviction and remanded the case for a hearing to determine whether there is substance to Wong's claim, raised for the first time on appeal, that his Fifth and Sixth Amendment rights were violated when a lawyer who had represented him in an earlier case allegedly helped target him as a defendant in the investigation that led to this case, assertedly with the connivance of the government and, later, of the lawyer who represented him in this case. *United States v. Wong Chi Keung*, 916 F.2d 67 (2d Cir.1990). Following that hearing, and a review of the post-hearing briefs, I have concluded for the reasons set forth below that there is no substance to Wong's charges, and accordingly the judgment of conviction will be reinstated.

It is helpful before reviewing the facts to understand the details of Wong's claim. Wong asserts that a lawyer who represented him in a 1987 immigration case began in 1988 to represent another defendant, Lai King Man, in a narcotics case brought in the Eastern District of New York. He asserts that the lawyer, Gerald M. Labush, Esq., worked out an arrangement with the government whereby an associate acting in Lai's behalf would help to catch Wong in a narcotics violation, such cooperation to be used to Lai's benefit in connection with sentencing in the Eastern District case. In addition, Wong claims that the government learned of Labush's alleged conflict of interest, arising from his prior representation of Wong, during a debriefing session with Lai, but then did nothing, and also that Labush in fact acted as counsel to Lai's associate, Ricky Lim, in helping to arrange the terms on which Lim would set up Wong. Further, Wong claims that when he was arrested on the charge that led to his current conviction, and sought to retain Labush as his lawyer, Labush failed to disclose his participation in the events that led to Wong's arrest, declined to represent Wong, and referred him instead to John Jacobs, Esq., with whom Labush allegedly had a relationship, whether or not including the sharing of fees, which assured that Jacobs would not disclose Labush's alleged betrayal of Wong and would represent Wong in a fashion consistent with the interests of Labush's current client, Lai. In particular, he faults Jacobs for failing to call Labush and/or Lai as witnesses at trial and to reveal the alleged wrongdoing of Labush and the government, a disclosure Wong believes would have made him the beneficiary of the jury's righteous indignation expressed in the form of a not guilty verdict.

Thus, Wong claims that he was the victim both of Labush's alleged disclosure of privileged information about him, with the government's participation, in violation of basic due process rights under the Fifth Amendment, and of Jacobs' inadequate representation at trial, in violation of his right to counsel under the Sixth Amendment.

I.

Four witnesses testified at the hearing: Labush, Jacobs, Lim, and Evelyn Ng, whose testimony concerned an unrelated case involving Labush and is summarized below only for the sake of completeness. The facts as developed at the hearing,[1] and at Wong's trial,[2] are as follows:

A. *Labush's Representation of Wong and Then of Lai*

Following Wong's arrest on an immigration charge in February 1987, he agreed to cooperate as an informant for the Drug Enforcement Administration, which led the government to file a *nolle prosequi* in Wong's immigration case in December

---

1. References to the hearing transcript are designated "HTr."

2. References to the trial transcript are designated "TTr."

1987. Wong was represented in the immigration case by Labush, whose firm had represented members of Wong's family in various civil matters. Labush had met Wong as early as 1981 or 1982. (HTr. 25–26) Wong's cooperation after the 1987 indictment apparently was not his first such activity. He suggested immediately after Labush began to represent him that Labush contact a DEA agent in Colorado in order to verify Wong's prior service as an informant. (HTr. 7, 57)

Labush's last attorney-client conversation with Wong occurred at the latest in January 1988, apparently incident to securing the return of Wong's bail, at which time Wong disclosed his unhappiness with DEA. Labush testified without contradiction by Wong or anyone else that Wong had never disclosed to him that Wong himself had engaged in narcotics trafficking. (HTr. 6–7)

In March 1988 Labush began to represent Lai in the Eastern District case. He concluded a cooperation agreement for Lai in that case that included cooperation with prosecutors in this District. Lai was to do three things: provide information about the drug trade between Asia and the United States, testify if necessary, and—because Lai remained in jail—arrange for another person to help DEA make cases based on Lai's information. That person turned out to be Ricky Lim. (HTr. 11–12)

The scope of this cooperation arrangement was discussed at a meeting in May 1988 attended by prosecutors from the Southern and Eastern Districts, DEA representatives, Lai and Labush. One of the DEA agents present who spoke Cantonese questioned Lai about Wong. At one point in the conversation, that agent informed Labush in English that Lai had just told of hearing from Lim that Wong was in the Orient looking for heroin. The agent apparently was aware of Labush's previous representation of Wong. That was when Labush first became aware that Wong was a potential target of Lai's cooperation. (HTr. 13–16)

Labush then stepped outside the room with the Southern District prosecutor, where they discussed the fact of Labush's previous representation of Wong and Labush expressed his discomfort at having his current client incriminate his earlier one (HTr. 15, 50–53), but Labush did not cease representing Lai nor did the government suggest he do so.

About a month later, in June, Lim arrived from Hong Kong. Labush took Lim to see Lai and then to a meeting with DEA agents at the United States Attorney's Office in the Southern District of New York. (HTr. 16–17) Again, it was the agents and not Lim or Lai who first mentioned Wong's name at this meeting. (HTr. 53–54) According to Lim, Lai instructed him to cooperate in making cases on three persons with whom Lim and Lai had dealt previously; Wong was one of them. (HTr. 108–09) Both Lim and Labush testified that although Labush brought Lim to the meeting with Lai and then with government representatives, the two did not converse. Labush spoke no Chinese, Lim no English. (HTr. 48–50, 111)

Although Wong insists that Labush negotiated the terms of Lim's cooperation with the government in Lai's behalf, including assurances he would not be prosecuted for his prior dealings with Wong, the only clear evidence on the subject was Lim's testimony that he was represented by appointed counsel, testimony he gave not only at the hearing (HTr. 120–21), but also at trial. (TTr. 410–12; GX 3501–I)

## B. The Events That Led to Wong's Conviction

Wong had purchased more than seven kilograms of heroin supplied by Lim through intermediaries in Hong Kong in the winter of 1987. In May 1988, as disclosed during Lai's meeting with the prosecutors, Wong spoke with Lim in Hong Kong, disclosed that he knew Lim to be the source of the heroin, and asked Lim to contact him when Lim was next in New York. (TTr. 271–85, 447–50) After agreeing to cooperate with DEA, Lim met Wong in Atlantic City in June 1988, and then had a tape recorded conversation with Wong at an OTB parlor in Chinatown in which Lim

advised Wong of a 35–"unit" (700 grams per unit) shipment of heroin arriving in August and Wong asked for 20 on consignment, to which Lim agreed. Lim said he was returning to Hong Kong but would contact Wong when he came back to New York. (TTr. 58–60, 159–60, 285–89, 514; GX 1A, 2)

Before Lim spoke again with Wong, DEA agents met with Wong to inquire into his knowledge of drug trafficking and to see whether he would disclose his negotiations with Lim. If he did not, the agents intended through this stratagem to deprive Wong of the claim that he was acting as a DEA informant during his negotiations with Lim. In a tape recorded conversation, Wong repeatedly denied knowing anything that would be of use to DEA. (TTr. 482–89, 494–97, 500–12; GX 8A)

Thereafter, Wong and Lim met again on August 1 and 3 to discuss the proposed transaction, which by then was to be for 30 "units," or approximately 21 kilograms. Wong referred to their past dealings while seeking and receiving assurance from Lim that the heroin would be of better quality than the earlier batch. It was agreed that Lim would transfer the heroin to Wong's accomplice, described as an old man, in front of a midtown hotel, while Wong observed from a discreet distance. (TTr. 312–16, 320–24, 328–29, 336–40, 460–64, 526–27; GX 4A)

On the appointed day, DEA agents provided Lim with a suitcase containing plaster packaged to look like heroin, and one kilogram of flour in which was embedded a sealed packet containing a gram of heroin. Wong parked across the street from the hotel, opened the hood of his car, and looked at Lim. When codefendant Tsoi Hi Lung approached Lim, Lim looked across the street at Wong, who in turn nodded his head and then drove off. Lim gave the suitcase to Tsoi, who was arrested as he was trying to find a cab. Wong was arrested several blocks away. (TTr. 248–49, 341–47, 518–21, 532–39, 570–74, 611–17; GX 6A)

C. *Wong's Retention of Jacobs, and the Trial*

Following his arrest, Wong sought to retain Labush, who said he could not represent Wong but referred his former client to Jacobs. Labush testified that he felt some obligation to Wong, based on their prior relationship, to recommend capable counsel, and not simply to leave Wong to his own devices. (HTr. 20, 40–41) He testified that he had known Jacobs since they served together in the office of the New York County District Attorney, and that he had no arrangement with Jacobs to share any fee from Wong or to engage in any reciprocal client referrals, testimony Jacobs confirmed (HTr. 21, 64–65), although they did refer clients to one another. (HTr. 83)

Wong sought to undermine Labush's and Jacobs' denial of any fee sharing by presenting the testimony of Evelyn Ng to the effect that she sought to retain Labush to represent her brother, whom Wong's counsel suggested had been arrested as the result of Wong's cooperation, and was referred to another lawyer, Stewart London. (HTr. 30–34) Ng testified that she left a portion of London's fee in cash at Labush's office. (HTr. 103–06) From this testimony, Wong argues that Labush must have obtained a portion of that fee, from which he hypothesizes that Labush obtained a portion of the fee Wong paid Jacobs. (HTr. 45)

Wong told Jacobs at the outset that he knew Labush had represented the informant. (HTr. 67–68) That is particularly significant because Wong's codefendant, Tsoi, eventually was represented by Marion Seltzer, Esq., Jacobs' wife, which necessitated a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), and *United States v. Curcio*, 694 F.2d 14 (2d Cir.1982), to assure that Wong and Tsoi were aware of the potential conflict inherent in such representation. As part of that hearing, I questioned Wong alone in the robing room, out of the presence of both counsel and his codefendant, to determine whether he wished to continue to be represented by Jacobs. Although I was unaware at the time of Jacobs' connection to

the lawyer who represented Lai and facilitated Lim's cooperation, Wong obviously was well aware of it. Wong stated firmly that he wanted Jacobs to continue to represent him. (10/14/88 Tr. 5–6)

Moreover, the Wong family retained Edward Chikofsky, Esq. to file motions in Wong's behalf. According to Jacobs, Chikofsky had freedom to file whatever motions he thought advisable. Jacobs and Chikofsky discussed Labush's representation initially of Wong and then of Lai. Chikofsky and Jacobs agreed that the situation did not present the basis for a potentially successful motion, and none was filed. (HTr. 66–67, 98)

At trial, Jacobs sought to develop an entrapment theory of defense and sought vigorously to discredit Lim, who testified for the government. Lim's role as surrogate for Lai was elicited, and Jacobs cross-examined Lim vigorously about Lim's and Lai's connection to a Chinese organized crime group known as the Triad or 14K. (TTr. 347–66, 380–401, 408–22) Wong now faults Jacobs for not having called Lai or Labush but, as was confirmed at the hearing, whatever advantage would have been gained by calling Lai at trial was already achieved by the disclosure of the connection between Lim and Lai, as disclosed in a written stipulation entered into between Wong and the government. (GX 18) Before that stipulation was entered into, Jacobs had left a subpoena for Lai at Labush's office (HTr. 69; TTr. 407), suggesting that he would have called Lai if necessary and undermining further Wong's current suggestion that Jacobs was trying to avoid anything that would have a negative impact on Labush's current client.

Jacobs saw distinct dangers in calling Labush, as follows: (1) Jacobs sought at trial to suggest that Wong's negotiations with Lim were part of Wong's cooperation, despite the evidence that Wong had not taken the occasion of his meeting with the agents to disclose those negotiations. Yet he was aware that Wong had not called Labush during those negotiations, and thus the government could show that Wong had not sought to consult even a friendly source of advice in order to create a record of his cooperation. (2) Jacobs was aware based on his conversations with his client that Wong and Lim had been involved in a prior narcotics deal, but was unaware of how much Labush knew of that prior relationship. He did not wish to risk waiver of the attorney/client privilege and possibly disastrous disclosures. (3) After Wong learned that Labush was representing Lai, whose agent Lim had been responsible for his indictment, Wong threatened Labush. Jacobs, uncertain of how extensively the government might be allowed to cross-examine Labush, did not wish to risk disclosure of the threat. (4) Labush's connection with the informant might further the impression of a connection between Wong and the informant, an impression Jacobs was seeking to avoid. (HTr. 72–74) By contrast, the advantages of calling Labush, after one works through the hyperbole that has pervaded Wong's post-conviction presentation, boil down to a gossamer hope for jury nullification, expressed by defense counsel as follows: "Indeed, exposed to Labush's treachery, a jury might well reject anything from the Government, where it was willing to take assistance so tainted" (Def. Brief 34); "You don't believe that it would have been admissible to show that Mr. Labush represented Mr. Wong in a matter, had him become an informant, had the case dismissed, now represents Mr. Man [sic; apparently a reference to Lai King Man], has him become an informant, but because he can't be released from jail, import Mr. Lim from Hong Kong, has him cooperate, and one of the targets is Mr. Wong, that the jury might not have felt, hey, what are these attorneys doing?" (HTr. 84)

Wong has argued also that Tsoi's representation by Jacobs' wife, Marion Seltzer, Esq., gives rise to some suspicion of impropriety. He notes, accurately, that Tsoi was represented initially by assigned counsel, and then claims, inaccurately, that Seltzer was employed by the Federal Defender when she took over Tsoi's representation. This unusual replacement of one appointed lawyer by a person alleged also to be an appointed lawyer is claimed by Wong to

have been motivated by a desire to assure that Tsoi was represented by someone who would not "spill the beans" as to the supposedly nefarious relationship between Jacobs and Labush. (HTr. 129) The fact is that Seltzer was retained, not appointed, regardless of what erroneous information may be contained on any record examined by defense counsel. Throughout the trial, it was clear that Seltzer, in addition to being married to Jacobs, practiced in the same office. The terms of Seltzer's retention were never disclosed, although Wong's counsel had ample opportunity at the hearing to call Seltzer if he had wished to do so. (HTr. 124–30)

## II.

The Court of Appeals directed that findings be made on at least the following issues, in addition to whatever other matters might be relevant:

"(1) the extent of Labush's role, on behalf of his current client, Lai, in selecting Wong as a target and planning the events that followed, (2) the extent of his role in selecting defense counsel for the heroin charges, (3) the existence of any fee-sharing or referral agreement between Jacobs and Labush, and (4) whether either Labush's role or Jacobs' representation impaired the validity of Wong's conviction."

916 F.2d at 68.

From the facts set forth above, it is apparent that Labush had no role in selecting Wong as a target and planning the events that followed. Wong was first mentioned as a target by the agents, not by either Labush or his current client. Moreover, the only evidence of Labush's conduct after the agents made it apparent that his former client was a target, insofar as it relates to the subsequent investigation, was that he brought Lim to visit Lai and then to talk to the prosecutors. He did not participate in planning how Lim would approach Wong nor, notwithstanding Wong's insistence to the contrary, did he ever represent Lim.

Second, Labush did recommend Jacobs as counsel to represent Wong. But third, there is no evidence of fee-sharing nor is there any evidence that there was a "referral agreement" between Jacobs and Labush beyond the simple fact that the two lawyers had referred cases to one another, apparently because of their long acquaintance.

The last issue—"whether either Labush's role or Jacobs' representation impaired the validity of Wong's conviction"—involves several sub-issues. The first is whether Labush continued to represent Wong after January 1988. I find based on the above facts that he did not. Whatever Wong's own expectations as to his prerogative to retain Labush whenever he wished to do so, our Circuit has rejected on more than one occasion the view that those involved in ongoing criminality may have permanent "house counsel." *United States v. Hammad,* 858 F.2d 834, 839 (2d Cir.1988); *United States v. Masullo,* 489 F.2d 217, 223 (2d Cir.1973).

The second subsidiary issue is what duty Labush owed to Wong even if he did not represent him. Wong's counsel has articulated none that exist in reality other than the perpetual duty to refrain from disclosing confidential communications unless Wong authorized their disclosure. There is no evidence that Labush violated that duty here. Indeed, Labush testified without contradiction that Wong had never disclosed his narcotics dealing, and thus there were apparently no confidences to be disclosed even if Labush had been inclined to do so. Wong argues that Labush had a duty to stop representing Lai as soon as he became aware that it might be to Lai's advantage to cooperate against Wong, and to warn Wong that an investigation was afoot. Yet to do so would have injured Lai, who was then Labush's client and stood to benefit from his own and Lim's cooperation. To the extent Wong argues that Labush simply should have ceased to represent Lai at that point, Wong has shown no prejudice from the fact that it was Labush rather than another lawyer who continued to represent Lai, inasmuch as there is no evidence that Labush disclosed anything

about Wong either to the government, or to Lim or Lai.

Wong draws adverse inferences from Labush's recommendation of Jacobs, but the record does not support him. At the point when Wong called Labush following his arrest, Labush could either have simply refused to represent his former client, or recommended one or more lawyers. If Labush had refused both to represent Wong and to recommend competent counsel, Wong could easily have argued that Labush thereby was injuring him still further. In retrospect, it may be that Labush might have been better advised to recommend more than one lawyer, but it is hard to see how a choice of counsel, assuming Labush could have offered it, would have helped Wong more than the recommendation Labush provided of one competent and experienced lawyer.

Nor is there anything in Jacobs' representation that in any way impaired Wong's conviction. To be sure, "prejudice is presumed when a defendant can 'establish that an actual conflict of interest adversely affected [her] lawyer's performance.'" *United States v. Jones*, 900 F.2d 512, 519 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990) (brackets in original) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)). But there has been no showing of either such a conflict or such an effect. It is a long way from the occasional reference of cases between Labush and Jacobs to the hypothesis, as to which there is no evidence, that there was some quid pro quo expected from Labush's reference of Wong's case to Jacobs. Wong has simply failed to do what he must in order to prevail: "identify an actual conflict of interest." *Jones, supra.*

Absent a real conflict, Wong must show that Jacobs' performance "fell below an objective standard of reasonableness ... and that but for this deficient conduct the result of the trial would have been different." *Jones, supra* (citations omitted). This he cannot do. Jacobs was throughout a skillful and persistent advocate.

Nor is there anything in Seltzer's retention by Tsoi to suggest a contrary result. Whatever were the terms of that retention, which Wong had the opportunity to explore at the hearing but did not, there is nothing to show that it was either intended to or did injure Wong. In particular, there having been no proverbial "beans" in the relationship between Jacobs and Labush, Wong cannot argue prejudice from Seltzer's failure to spill any.

For the above reasons, the judgment of conviction is reinstated.

SO ORDERED.