**UNITED STATES of America, Appellee,**

v.

**Lisa JONES, Defendant–Appellant.**

**No. 583, Docket 89–1425.**

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1990.

Decided March 30, 1990.

Helen Gredd, Asst. U.S. Atty., New York City (Louis J. Freeh, Acting U.S. Atty., S.D.N.Y., Mark C. Hansen, Asst. U.S. Atty., Peter G.A. Safirstein, Sp. Asst. U.S. Atty., of counsel), for appellee.

Daniel H. Bookin, San Francisco, Cal. (Douglas W. Sortino, Farella, Braun & Martel, of counsel), for defendant-appellant.

Before KEARSE, MINER, and WALKER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Lisa Jones appeals from a judgment of conviction entered August 23, 1989, after a jury trial, in the United States District Court for the Southern District of New York (Sand, *J.*). Jones was convicted of five counts of making false declarations before a grand jury in violation of 18 U.S.C. § 1623 (1988) and two counts of obstruction of justice in violation of 18 U.S.C. § 1503, based on her testimony before a federal grand jury investigating a "securities parking" scheme involving her employer, the investment firm of Drexel Burnham Lambert, Inc. After increasing the base offense level under Sentencing Guidelines § 2J1.3(b)(2) because Jones had "substantially interfered with the administration of justice," the district court sentenced Jones to concurrent terms of imprisonment for 18 months on each count. The court also imposed a fine of $50,000 and a special assessment of $350.

On appeal, Jones asserts her trial counsel was burdened by conflicts of interest, rendering his assistance ineffective. These conflicts are said to arise from the prosecutor's threat of disciplinary charges against

Jones' attorney relating to a letter that the attorney had sent to the government in her behalf, and the attorney's concurrent representation of other Drexel employees. The government contends that the district court properly determined after a hearing that no actual conflicts of interest existed.

Jones contends also that the district court erred in allowing cross-examination into her history of making false statements, because this evidence was used, in violation of Fed.R.Evid. 404(b), to prove she acted in conformity with a character for untruthfulness. The government argues that this line of questioning was permissible under Fed.R.Evid. 608(b) and was relevant to her credibility as a witness.

In light of a post-trial revelation that one of the jurors was related to an Assistant United States Attorney for the District of New Jersey, Jones asserts that the district court abused its discretion by refusing to ask specifically whether any jurors had relatives who were government attorneys. The government responds that the court's broad inquiry into possible bias on *voir dire* provided Jones with adequate information to exercise peremptory challenges.

Finally, Jones assigns as error the district court's increase of her base offense level on the ground that she "substantially interfered with the administration of justice" within the meaning of Sentencing Guidelines § 2J1.3(b)(2). Jones contests as unsupported by any evidence the government's assertion that her conduct resulted in "the unnecessary expenditure of substantial governmental or court resources." Guidelines § 2J1.3 application note 1. The government argues that unnecessary expenditures could be inferred from the complex nature of its investigation and the information known to Jones.

For the reasons that follow, we affirm the convictions for making false statements before a grand jury and obstruction of justice. However, we find the record insufficient to support the district court's increase of the base offense level under the Sentencing Guidelines and, therefore, we vacate the sentence and remand for resentencing.

## BACKGROUND

Lisa Ann Jones ran away from home in New Jersey at the age of 14 to seek her fortune in California. By misstating her age, she found employment initially at a bank and ultimately found success at the California offices of Drexel Burnham Lambert, where she was hired as an assistant trader. At Drexel her income soared from approximately $20,000 in 1981 to $100,000 in 1988. She dealt with traders and their assistants at other investment firms around the country, working on transactions involving millions of dollars.

On December 17, 1987, Jones was served with a subpoena to testify before a grand jury in the Southern District of New York investigating "securities parking" transactions between her employer and another investment firm with which she dealt, Princeton/Newport Partners, L.P. "Securities parking" essentially involves a purported transfer of ownership in securities combined with a secret agreement providing the "seller" with the right to repurchase them at a later date. The "seller" receives the tax benefits of a loss realized by the "sale"; the "buyer" is compensated for the "cost of carrying" the securities. Since the agreement to resell ensures that the "seller" never loses control of the securities, the government considers "parking" a form of tax and securities fraud. The government investigator who served Jones with the subpoena asked if she knew of any "parking" deals involving Drexel and Princeton/Newport. Jones denied knowledge of "parking" deals, although she said there had been deals in which Drexel would purchase bonds, only to resell them to Princeton/Newport within 30 or 33 days. Jones asked to speak with an attorney before answering any more questions. The government investigator recommended that she seek counsel independent of the attorneys representing her employer.

Drexel knew of the investigation and had retained two New York City law firms— Cahill Gordon & Reindel and Curtis, Mallet–Prevost, Colt & Mosle—to represent itself and its employees. When Jones ap-

peared before the grand jury on January 11, 1988, she was represented by Drexel's attorneys. Jones did not testify at that time because she requested and received additional time to prepare. At the start of her second appearance on January 13, an Assistant United States Attorney ("AUSA") informed Jones of her rights to have independent counsel and to have an attorney appointed if she could not afford one. The AUSA told Jones that her attorneys represented Drexel and that her interests and Drexel's interests in the investigation might differ. Jones replied that she was satisfied with her lawyers. When she invoked her fifth amendment right against self-incrimination, Jones was served with a compulsion order granting her immunity from prosecution on the basis of her testimony. She then testified that she could not recall ever discussing or calculating the cost of carrying securities for Princeton/Newport. Jones testified specifically that she never discussed the cost of carrying with William Hale or Paul Berkman of Princeton/Newport, and that she never kept a record of such costs.

Jones returned to the grand jury on January 20 and was reminded of the compulsion order. She was told again that she had been granted immunity from criminal prosecution, but that she had to testify truthfully or she would be subject to prosecution for perjury or obstruction of justice. Jones testified that she had never heard of any instance in which Drexel purchased a security from a client with the understanding that the client would buy it back at a later date. She denied knowledge of any such understanding between Drexel and Princeton/Newport, stating: "If I knew that there was an agreement or arrangement, I think I would have remembered it." On January 27, Jones testified that she had no information concerning who might have engaged in parking transactions involving Drexel and Princeton/Newport.

On February 23, 1988, the government informed Jones' lawyers that she was a target of a federal grand jury investigating perjury and other possible violations of federal criminal law. Apparently unknown to

Jones, her counterpart at Princeton/Newport, William Hale, had preceded her before the grand jury and had testified to parking transactions involving Drexel and Princeton/Newport. The government also had obtained a tape recording of a telephone conversation between Hale and Jones relating to calculations for the cost of carrying securities Princeton/Newport had sold to, then repurchased from, Drexel. Jones retained new counsel, Brian O'Neill, on July 18 and shortly thereafter learned that an indictment was imminent.

At an August 2, 1988 meeting with representatives of the United States Attorney's Office, Jones and O'Neill heard the recording of the telephone conversation between Hale and Jones. The recording revealed that Jones understood that the securities would be held for 32 days, then resold to Princeton/Newport, and also that she understood the intricate calculations involved in the transactions.

O'Neill discussed the tapes with Jones, who said they had refreshed her recollection of events. In an attempt to avoid an indictment, Jones authorized O'Neill to inform the government of testimony she could provide now that her memory was refreshed. O'Neill so informed the government, and later memorialized that oral proffer in a letter, also authorized by Jones, to the United States Attorney's Office. The proffer letter stated that Jones now recalled discussing with Hale securities to be bought by Princeton/Newport from Drexel at the same price at which Drexel had originally purchased them from Princeton/Newport. Jones and Hale calculated "the cost to Drexel of maintaining Princeton's position in the security," including an accommodation for intervening changes in the market price. At some point, she recalled learning that there was to be a 31-day interval between purchase and sale. However, Jones denied ever hearing the terms "parking" or "tax trade" used to describe the transactions. She said they were described to her in "cryptic terms" and were once referred to as "program trading." Despite the proffer letter, an indictment was filed on November 9,

1988, charging Jones with five counts of making false statements to a grand jury in violation of 18 U.S.C. § 1623 and three counts of obstruction of justice in violation of 18 U.S.C. § 1503.

Jones testified in her own behalf at trial. On cross-examination, the prosecutor questioned Jones about various transactions similar to those discussed in the tape recorded conversation with Hale. Jones responded that she "had conversations with Mr. Hale that may be like those, but [was] not aware that they were parking." When the prosecutor asked whether Jones and Hale had any conversations, other than the one recorded, "about that subject," the court sustained an objection on grounds that the question was vague and ambiguous. The prosecutor then asked whether Jones had any other conversations with Hale "in which you discussed the parking of securities." A series of objections and rulings ensued, after which the court stated that the question was "whether she ever had conversations with Mr. Hale on that subject." Jones responded, "I don't know all the conversations I had with Mr. Hale." The prosecutor asked whether she could recall any other conversations with Mr. Hale "on the subject I just asked you about?" Jones said no.

The prosecutor then approached Jones and showed her the proffer letter O'Neill had sent to the government. O'Neill requested a sidebar and the jury was dismissed for the weekend. During the sidebar, the prosecutor expressed "outrage" at the prospect of Jones refusing to admit to statements made in the proffer letter. He also raised ethical considerations concerning O'Neill's representation and cited specific disciplinary rules from the Model Code of Professional Responsibility concerning an attorney's duty not to suborn perjury. The court adjourned until later that afternoon to examine the letter and the testimony and to allow the prosecutor to consult with his office.

During the afternoon recess, Jones conferred with Eileen McDevitt, an attorney who was assisting O'Neill in the trial. Jones told McDevitt that the contents of the proffer letter were accurate, and that at no time had Jones thought anything in the letter was inaccurate.

After comparing Jones' testimony with the proffer letter, the court determined that the testimony did not contradict the information contained in the letter. At best, the questions referring to "that subject" were ambiguous. Moreover, the court read "that subject" to mean "parking," a term which the proffer letter explicitly stated Jones had never heard used to describe the transactions. The court ruled that the proffer letter would be inadmissible unless Jones contradicted it in her testimony. The prosecutor never again threatened O'Neill with any disciplinary charges.

O'Neill arranged for Jones to consult with Robert J. Costello, an attorney not connected to the case, over the weekend recess. He explained to Costello that there was a potential conflict because he had written a proffer letter for Jones and might be called as a witness. O'Neill said he expected Jones' testimony to be consistent with the letter. Jones and Costello met, and each stated later that Jones had expressed an intention to give testimony that would be consistent with the letter.

When cross-examination resumed, Jones did not contradict the terms of the proffer letter. Nevertheless, following her conviction and a substitution of counsel, Jones moved for a new trial pursuant to Fed.R. Crim.P. 33 on the ground, inter alia, that the threat of disciplinary charges against O'Neill created a conflict of interest rendering his assistance ineffective. Although the district court determined it did not have jurisdiction over the motion because it had not been made within seven days of the verdict, the court decided to address what it considered "serious allegations" challenging the "professional reputation and integrity of trial counsel."

The court found the record devoid of any showing of intent by Jones to disavow the proffer letter. O'Neill, his associate, and the attorney Jones consulted over the weekend recess each stated that Jones had indicated her intent to give testimony consistent with the statements made in the

proffer letter. Although Jones stated in a declaration submitted in connection with the motion for a new trial that there were times when she could not remember some of the details mentioned in the letter, she affirmed that she never intended to contradict the letter. In ruling on the motion, the court reiterated its earlier finding that the questions asked on cross-examination were ambiguous and that Jones' answers were not inconsistent with the proffer letter. In the absence of any showing that the statements in the proffer letter were false, the court held that no actual conflict existed between Jones and O'Neill and denied the motion for a new trial.

Jones' sentence for making false statements before a grand jury was calculated by first applying the Sentencing Guideline for perjury, which prescribes a base offense level of 12. Guidelines § 2J1.3(a). All five false statement counts, as well as the two obstruction of justice counts, were considered as a group for sentencing purposes pursuant to Guidelines § 3D1.2(c). See Guidelines § 2J1.2 application note 3. Under Criminal History Category I, assigned to Jones because she had no prior convictions, a base offense level of 12 would result in a sentencing range of 10 to 16 months. Guidelines ch. 5, pt. A, Sentencing Table. The government argued for an upward adjustment of the base offense level by three levels, resulting in a sentencing range of 18 to 24 months, because Jones had "substantially interfered with the administration of justice" by causing "the unnecessary expenditure of substantial governmental or court resources." Guidelines § 2J1.3(b)(2) & application note 1. Proof of unnecessary expenditures, the government asserted, could be inferred from the complex nature of the investigation and the information withheld by Jones.

Jones argued that the government's vague, general assertions did not suffice to prove by a preponderance of the evidence that her false statements before the grand jury resulted in the unnecessary expenditure of substantial resources. In opposition to the government's request for sentencing enhancement, Jones submitted an affidavit by Theodore V. Wells, an attorney who represented one of the defendants in the Princeton/Newport "securities parking" trial. Wells stated that the Princeton/Newport defendants did not contest the existence of a parking arrangement or Drexel's calculation of the cost of carrying securities. Rather, their defense was that these activities were not illegal because the transactions had economic substance. The fact that Jones had denied knowledge of parking arrangements and denied calculating the cost of carrying securities did not warrant an inference of increased expenditures related to the Princeton/Newport trial, because the pertinent information was available to the government at an early stage. Wells noted that Hale had provided the government with details of parking transactions before Jones' grand jury testimony. An affidavit by a government investigator submitted in support of a search warrant for Princeton/Newport's offices also described the transactions in great detail prior to Jones' appearance before the grand jury.

The district court initially suggested that it would increase Jones' base offense level under the Guidelines section for substantial interference with the administration of justice because the presentence report had recommended such an enhancement. When counsel for Jones objected, the court entertained argument from both sides. The court rejected Jones' arguments, and apparently settled on an offense level of 15 because there had been "three separate instances of perjury after the advice and admonitions given to the defendant, and the further perjury at the trial." Perceiving that the perjury resulted in substantial interference with the administration of justice, the court imposed a sentence of imprisonment for 18 months on each count, to run concurrently.

## DISCUSSION

### I. *Effective Assistance of Counsel*

■ Jones asserts she was denied effective assistance of counsel in violation of her rights under the sixth amendment, because the prosecutor's threat of disciplinary

charges against O'Neill created a conflict of interest between attorney and client. Ordinarily, a defendant asserting ineffective assistance of counsel must establish both that her attorney's conduct fell below an objective standard of reasonableness, *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and that but for this deficient conduct the result of the trial would have been different, *id.* at 694, 104 S.Ct. at 2063. However, prejudice is presumed when a defendant can "establish that an actual conflict of interest adversely affected [her] lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).

An actual conflict of interest exists when an attorney engages in wrongful conduct related to the client's trial. *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984); *Solina v. United States*, 709 F.2d 160, 164 (2d Cir.1983). In such a situation, the fear of prompting a government investigation into the attorney's own wrongdoing would preclude an attorney from asserting a vigorous defense in behalf of his client. Jones seeks to extend this rule to reach an instance where the prosecutor threatened disciplinary action, without proof that the allegation of wrongdoing had any basis in fact or law.

When allegations are supported by some credible evidence, disciplinary or criminal charges become more than mere threats, and the attorney has "reason to fear that vigorous advocacy on behalf of his client would expose him to criminal liability or any other sanction." *Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir.1988). However, "a reviewing court cannot presume that the *possibility* for conflict has resulted in ineffective assistance of counsel." *Cuyler v. Sullivan*, 446 U.S. at 348, 100 S.Ct. at 1718 (emphasis added). The defendant must identify an actual conflict of interest. *United States v. Lovano*, 420 F.2d 769, 773 (2d Cir.), *cert. denied*, 397 U.S. 1071, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970). Allegations of wrongdoing alone cannot rise to the level of an actual conflict unless the charges have some foundation. *See United States v. Osorio Estrada*, 751 F.2d 128, 132 (2d Cir. 1984), *aff'd on reh'g*, 757 F.2d 27, 29 (2d Cir.), *cert. denied*, 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985); *cf. United States v. Arrington*, 867 F.2d 122, 125 (2d Cir.) (district court determined that credible witness " 'would really testify in a way to implicate and accuse' " defense counsel in a scheme to keep witnesses from testifying), *cert. denied*, —— U.S. ——, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989); *Cancilla*, 725 F.2d at 868 n. 1 (court assumed "arguendo that counsel did engage in such criminal activities"); *Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 128 (3d Cir.1984) (law enforcement officers saw attorney enter defendant's residence, heard toilet flush several times, and later discovered cocaine in septic tank).

In stark contrast to the cases in which an actual conflict has been found, the evidence before Judge Sand indicated that the prosecutor's hysterics were without foundation in fact or law. During his tirade on March 16, the prosecutor alluded to possible violations of Model Code of Professional Responsibility DR 7–102 and EC 7–26 if Jones contradicted the statements made in the proffer letter. These provisions prohibit an attorney from using testimony when "he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured." EC 7–26, N.Y.Jud.Law App. (McKinney 1975); *see also* DR 7–102, N.Y. Jud.Law App. (McKinney 1975 & Supp. 1990). Apart from the brief confusion caused by the prosecutor's ambiguous questions, at no time has there been any suggestion that the proffer letter was false, let alone that O'Neill knew or should have known it was false. After examining the proffer letter and Jones' testimony on March 16, Judge Sand determined that Jones had not contradicted the letter and so informed the government and O'Neill. At that point in time there was no actual conflict of interest, *see Lovano*, 420 F.2d at 774, and O'Neill was free to pursue a vigorous defense.

■ The prosecutor's contention that Jones would not be permitted to profess a lack of memory on cross-examination concerning the statements made in the proffer letter was not made in connection with the threat against O'Neill. Rather, the prosecutor was arguing that Jones' failure to remember would result in the government's offer of the proffer letter in evidence. Had the letter been admitted under these circumstances, O'Neill would have been confronted with the possibility of being called as a witness. Jones claims that because of this possibility "O'Neill could not make ... disinterested, objective tactical decisions or give Jones ... disinterested, objective advice." However, O'Neill prudently sought to have Jones consult with an independent attorney before considering possible alternatives. Any potential conflict here never ripened into an actual conflict, because Jones told independent counsel that her testimony would be consistent with the letter.

■ Jones' claim also must fail because she has not demonstrated that any conflict of interest adversely affected O'Neill's performance. Jones asserts that O'Neill could have pursued a defense based on her inability to remember the statements made in the proffer letter. Of course, O'Neill could only pursue this defense if it were true. *See Nix v. Whiteside,* 475 U.S. 157, 176, 106 S.Ct. 988, 999, 89 L.Ed.2d 123 (1986). There was no basis for this defense at the time of trial, because Jones consistently said that the proffer letter refreshed her memory and that it was accurate.

■ The proffer letter ultimately was admitted in evidence, in a redacted form, at the request of Jones. She asserts that O'Neill was made a witness against her because the prosecutor referred to the proffer letter in summation. The problem of an attorney giving testimony against his client is that the jury "may place undue weight on the testimony of an officer of the court." *Arrington,* 867 F.2d at 126. No such problem arose here, because O'Neill's name never was mentioned. *See United States v. Diozzi,* 807 F.2d 10, 14 n. 8 (1st Cir.1986).

■ Finally, Jones asserts an actual conflict of interest based on O'Neill's representation of other Drexel employees. Mere representation of other defendants in related cases does not constitute an actual conflict. *Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718. Four of the five other Drexel employees represented by O'Neill had been granted immunity by the government. Jones' argument that these four employees had an interest in maintaining good relations with Drexel finds no support in the record.

■ Absent some showing of conflict, we cannot say that the district court abused its discretion in finding O'Neill's actions to be the result of tactical decisions. *See id.* at 348–50, 100 S.Ct. at 1718–19. O'Neill's decision not to call Drexel's attorneys as witnesses or subpoena their notes, far from falling below an objective standard of reasonableness and professional conduct, was a legitimate trial tactic to avoid the implication that Jones was controlled by Drexel by reason of Drexel's payment of her attorney's fees.

## II. *Prior False Statements*

■ On cross-examination, the prosecutor questioned Jones about a number of false statements she had made on applications for employment, an apartment, a driver's license, a loan, membership in the National Association of Securities Dealers, and on her income tax returns. The court ruled that, considering the fact that Jones had professed an inability to remember certain facts before the grand jury, this line of questioning would be permitted "to probe just what Miss Jones means when she says 'I don't remember.'" Jones admitted making each false statement.

On appeal, Jones asserts that the cross-examination was improper under Fed.R. Evid. 404(b), because it was pursued to prove action in conformity with a character for untruthfulness. The government contends that the questioning was proper under Fed.R.Evid. 608(b) to impeach Jones' credibility.

"Pursuant to Fed.R.Evid. 608(b), the trial judge may permit cross-examination into specific acts of misconduct if 'probative of truthfulness or untruthfulness.'" *United States v. Bagaric*, 706 F.2d 42, 65 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Jones testified throughout the grand jury proceedings and her trial that she could not remember important facts. The inquiry into her history of intentionally making false statements was proper because it "tend[ed] to undermine defendant's innocent explanation" that her false statements were the result of a faulty memory. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[12], at 404–84 (1989). "'[T]he oftener a like act has been done, the less probable it is that it could have been done innocently.'" *Id.* at 404–84 to 404–87 (quoting 2 Wigmore, *Evidence* § 312 (3d ed. 1940)).

### III. *Voir Dire*

██ Approximately one week after the jury's verdict, the government informed the court and defense counsel that one of the jurors had a son who was an Assistant United States Attorney for the District of New Jersey. The district court had not asked one of Jones' proposed questions on *voir dire* concerning whether any juror was, or had relatives who were, government attorneys. The court did ask, however, a number of questions concerning whether any family members or close friends had ever been a defendant in a criminal case or involved in grand jury proceedings. The court asked the occupation of any one living with the prospective juror. The court asked also whether there was any reason not covered by a specific question that would prevent a potential juror from being fair and impartial. The juror in question had said no to each of these questions.

Following the revelation of a connection with a prosecutor in another jurisdiction, the district court held a hearing and questioned the juror in the presence of counsel. The juror explained that he did not have daily contact with his son, he had limited knowledge of his son's work, and he had not volunteered the information because he did not feel it would prevent him from being impartial.

An appellate court will not interfere with the conduct of *voir dire* unless the defendant can show a clear abuse of the district court's discretion. *United States v. Barton*, 647 F.2d 224, 230 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Considering the extensive inquiry into possible bias on *voir dire*, and the complete absence of any evidence that the verdict was tainted, the district court did not abuse its discretion by refusing to ask one specific question which may or may not have resulted in an exercise of a peremptory challenge by Jones.

### IV. *Sentencing*

██ Jones challenges as unsupported by the record the enhancement of her base offense level from 12 to 15 on the ground that she "substantially interfered with the administration of justice" by causing "the unnecessary expenditure of substantial governmental or court resources." Guidelines § 2J1.3(b)(2) & application note 1. Appellate review of a district court's sentence is limited to whether the sentence was "imposed in violation of law," was "imposed as a result of an incorrect application of the sentencing guidelines," or was "outside the applicable guideline range, and is unreasonable." 18 U.S.C. § 3742(e), (f). The factors underlying a sentence need only be proved by a preponderance of the evidence, *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), and the district court's findings of fact will not be disturbed unless clearly erroneous, 18 U.S.C. § 3742(e).

The record reveals that "[t]he court did not 'merely approve or disapprove' the recommendations in the presentence report." *United States v. Lanese*, 890 F.2d 1284, 1291 (2d Cir.1989). Jones and the government both briefed and argued the issue of sentencing enhancement. The district court explicitly rejected Jones' arguments. However, the district court did not make any specific finding that Jones' perjury had resulted in any substantial expenditure of

governmental resources. *Cf. United States v. Adames,* 901 F.2d 11 (2d Cir. 1990); *United States v. Buenrostro,* 868 F.2d 135, 137 (5th Cir.1989) (citing *United States v. Mejia-Orosco,* 867 F.2d 216, 221 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989)). Moreover, we cannot say that a preponderance of evidence in the record supports the government's assertion that substantial expenditures were caused by Jones' false statements to the grand jury.

A preponderance of evidence may consist of reasonable inferences drawn from circumstantial evidence. The government need not particularize a specific number of hours expended by government employees. In some cases, when the defendant has concealed evidence and is the only known source of information, substantial interference with the administration of justice may be inferred. *See United States v. Barnhart,* 889 F.2d 1374, 1379–80 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1307, 108 L.Ed.2d 483 (1990). The government urges such an inference here, but Jones produced in the district court, in the form of Hale's testimony and the government's application for a search warrant for Princeton/Newport's offices, substantial evidence that the government already had the information Jones concealed. In the absence of any showing of evidence concealed by Jones and not already known by the government, we cannot conclude that unnecessary expenditures have been established by a preponderance of the evidence.

■ Of course, the three level enhancement for substantial interference with the administration of justice is not limited to conduct resulting in substantial expenditures of governmental resources. *Id.* It also "includes offense conduct resulting in a premature or improper termination of a felony investigation, [or] an indictment or verdict based upon perjury, false testimony, or other false evidence." Guidelines § 2J1.3 application note 1. The district court here stated that it enhanced Jones' sentence because of "three separate instances of perjury after the advice and admonitions given to the defendant, and the further perjury at the trial." Apparently it was the view of the district court that these instances of perjury resulted in substantial expenditures of governmental resources. As we have indicated, no such expenditures have been demonstrated. Moreover, these instances of perjury, standing alone, do not constitute the type of egregious conduct envisioned by the Guidelines as substantial interference with the administration of justice. Accordingly, the sentence imposed must be vacated.

### CONCLUSION

The judgment of conviction is affirmed. The sentence imposed is vacated. We remand for resentencing in accordance with the foregoing.