UNITED STATES of America,

v.

Jerry WEISSMAN, Defendant.

No. S2 94 CR. 760 CSH.

United States District Court,
S.D. New York.

Sept. 24, 1998.

Michael S. Sommer, Otto G. Obermaier, U.S. Atty., Southern District of New York, New York, NY, for U.S.

Walter P. Loughlin, Latham & Watkins, New York, NY, for Jerry Weissman.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Defendant Jerry Weissman is awaiting sentence following his conviction after jury trial on charges of obstruction of justice and perjury. The Probation Office's Presentence Investigation Report ("PSR"), and the subsequent sentencing memoranda submitted by the government and defendant, reflect disagreements with respect to the proper calculations under the United States Sentencing Guidelines ("USSG"), and whether the Court should depart from the guidelines as ultimately calculated. In that latter regard, the government contends for an upward departure and Weissman for a downward departure.

This opinion resolves all issues pertinent to the USSG calculations. The PSR states the Probation Office's reasoning in detail. The parties' briefs discuss those issues at length. The Court has considered all these matters. This opinion will conclude with the guideline range as calculated by the Court. At the sentencing hearing, counsel will not be further heard on that aspect of the case.

I reserve decision on whether a departure from the guideline range, upward or downward, should be made. Counsel may argue those issues at the sentencing hearing.

### I

This case has been extensively litigated. The trial, which began on January 6, 1997 and concluded on March 3, 1997, was preceded by a lengthy evidentiary hearing on an asserted privilege, and followed by motion practice with respect to the liability of Weissman's former employer to continue to pay his legal fees. There have been protracted ne-

gotiations between counsel for the parties and the Probation Office, in an unsuccessful effort to agree on the proper USSG range. Such activity as took place before this Court generated a number of written decisions. Familiarity with them all is assumed.

For present purposes, it is sufficient to state that at the pertinent times, Weissman was the Chief Financial Officer ("CFO") of Empire Blue Cross and Blue Shield ("Empire"), the New York component of the nationwide Blue Cross and Blue Shield network of medical expense insurers. In December 1992, the United States Senate Permanent Subcommittee on Investigations of the Committee on Government Affairs ("the Subcommittee" or "the PSI"), then chaired by Senator Sam Nunn, began investigating Empire as a part of the Subcommittee's broader inquiry into the Blue Cross and Blue Shield network. A time came when counsel to the Subcommittee served a subpoena to obtain documents upon Empire. Weissman was the officer at Empire responsible for responding to the subpoena. Certain documents were produced under his direction. The Subcommittee then called Weissman to testify. He gave deposition testimony before staff counsel on June 11 and 22, 1993, and testified before the Subcommittee itself on June 30.

The indictment in this case contained four counts. Count One charged that in responding to the Subcommittee's documents subpoena, Weissman obstructed justice, in violation of 18 U.S.C. § 1505, in three ways: by altering information contained in certain documents; by causing Empire not to produce the unaltered information; and by causing Empire to destroy certain subpoenaed documents and files. Counts Two, Three, and Four charged Weissman with perjury, in violation of 18 U.S.C. § 1621(1), during the June 11 and June 22 depositions and the June 30 Subcommittee testimony, respectively.

At the end of the government's case at trial, the Court dismissed the third theory of obstruction of justice, namely, destruction of documents. The jury was asked to render its verdict in the form of special interrogatories. It convicted Weissman of obstructing justice by altering one of three documents specified in the verdict form, and of causing Empire not to produce both specified documents. The jury failed to reach a verdict on Count Two, which contained one specification of perjury. It convicted him on three of eleven specifications in Count Three, and on two of four specifications in Count Four.

II

Prior to trial, Weissman moved to dismiss the indictment or to preclude evidence on the ground that Empire and its outside counsel had breached a joint defense agreement with Weissman by communicating certain information to the government. Specifically, Weissman contended that as the result of that joint defense agreement, statements he made at a June 16, 1993 meeting were protected from disclosure to the government by the attorney-client privilege. The participants in that meeting were Weissman; his attorney, John Kenney; Alan Drewsen, general counsel of Empire; and Louis Craco, Empire's outside counsel.

The government challenged Weissman's assertion that he and Empire had entered into a joint defense agreement during the June 16 meeting. I held that Weissman bore the burden of proving by a preponderance of the evidence that he and Empire had explicitly agreed to a joint defense agreement, and conducted an evidentiary hearing to determine if Weissman could sustain that burden. The hearing took place in September, 1995. The witnesses included Weissman, Kenney, Drewsen, and Craco.

Kenney and Weissman testified, in substance, that at the beginning of the June 16 meeting (in a conference room at the offices of Kenney's law firm, to which he had summoned Drewsen, who brought Craco with him), Kenney told Drewsen and Craco that any statements Weissman might make would be covered by a joint defense agreement between Weissman and Empire, and that Drewsen and Craco signified their assent. Drewsen and Craco testified, in substance, that Kenney never made any reference to a joint defense agreement before Weissman began to speak.

After reviewing that testimony and the other evidence in the record, I found that

"Weissman has failed to prove by a preponderance of the evidence that a joint defense agreement was explicitly agreed to at the June 16 meeting." Memorandum Opinion and Order dated April 3, 1996 at slip op. 35.

In the sentencing context, the government now argues that Weissman is subject to a two-level obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. That section applies if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The Application Notes to § 3C1.1 provide that examples of the types of conduct to which the enhancement applies include "committing, suborning, or attempting to suborn perjury" and "providing material false information to a judge." Notes 3(b) and (f). Specifically, the government contends that Weissman committed perjury, and consequently provided material false information to this judge, by testifying falsely at the privilege hearing that Kenney began the June 16 meeting with the declaration that a joint defense agreement was in effect, and that Drewsen and Craco indicated their assent.

Weissman opposes this enhancement. The Probation Office properly concluded that the issue was one for resolution by the Court, and expressed no opinion with respect to it.

■ The government correctly observes that a § 3C1.1 obstruction-of-justice enhancement for a defendant's perjury committed at trial is constitutionally valid, see *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct.

1111, 122 L.Ed.2d 445 (1993), and that the enhancement also applies to perjured testimony during a pre-trial hearing, see *United States v. Giraldo*, 80 F.3d 667, 680 (2d Cir. 1996). Weissman's testimony about Kenney's declaration was clearly material—nay, central—to the issues at the hearing.

■ In the sentencing context, the government bears the burden of proving that Weissman's hearing testimony was perjurious, a burden that includes a showing of specific intent, *Giraldo*, 80 F.3d at 680. Accepting without deciding that, as the government contends, that burden is one of preponderance of the evidence,[1] I conclude that the government has failed to meet it.

The central question of fact at the privilege hearing was not easy for me to resolve. As I observed in the April 3, 1996 opinion, none of the four participants at the June 16, 1993 meeting at Kenney's offices was disinterested.[2] Neither account was inherently implausible. No independent evidence pointed compellingly to one conclusion or the other. In those circumstances, I concluded then that Weissman had failed to sustain his burden of proof that a joint defense agreement existed. Regarding the circumstances as essentially the same, I conclude now that the government has failed to sustain its burden of proof that Weissman lied when he testified that the agreement had been reached.

Apparently apprehensive of that conclusion, the government argues in its letter brief at 14–15 that the present circumstances are different.[3] The government stresses that at

---

**1.** Weissman contends that the government's burden is one of clear and convincing evidence. The dispute arises out of an amendment, effective November 1, 1997, to Application Note 1 to U.S.S.G. § 3C1.1. The government perceives in that amendment a lowering of its burden of proof in § 3C1.1 cases. For the reasons stated in text, I conclude that the government has not met the less onerous burden, and consequently need not resolve this particular issue, with its accompanying *ex post facto* concerns.

**2.** I there wrote:

None of the four witnesses is disinterested. Weissman's interest in establishing a privilege shielding his June 16 declarations from disclosure is apparent. Kenney is interested in demonstrating that he provided maximum protec-

tion for his client. As for Craco and Drewsen, if Weissman and Empire agreed explicitly to a JDA on June 16, then the subsequent disclosure of Weissman's declarations by Willkie Farr, Empire's counsel [of which Craco was a partner] to the government breached that agreement. Craco and Drewsen would obviously prefer that a finding of unprofessional conduct not be made.

*Id.* at slip op. 198–99.

**3.** The government's apprehension is manifested by its introductory phrase: "Although it is possible that the Court's prior opinion, which was based only on the record of the pretrial hearing, contemplated an evidentiary 'tie' in which the proof regarding an explicit joint defense agreement stacked up fifty-fifty …" *Id.* at 192. That professed possibility was, of course, the reality.

trial the jury convicted Weissman of perjury before the Subcommittee, a post-pretrial hearing finding with respect to pre-hearing events which the government contends "the Court may now take into account in determining whether to credit his testimony at the pretrial hearing regarding the existence of an explicit joint defense [agreement] or whether that testimony was wilfully false." Letter Brief at 14.

Assuming without deciding that the government's retroactive use of Weissman's perjury conviction at trial to test the credibility of his pretrial hearing testimony on a different subject does not run afoul of Rule 404(b), Rule 608(b), or Rule 609, Fed.R.Evid., its position would be stronger if Weissman alone testified to the declaration of a joint defense agreement at the beginning of the June 16 meeting. The fact, however, is that Kenney testified with at least equal certainty that he, Kenney, prefaced the meeting with an explicit reference to a joint defense agreement. Weissman's testimony, in substance, is that he remembered Kenney saying what Kenney testified he said.

That presents the government with something of a problem, because Kenney is a highly respected criminal defense attorney whose career includes distinguished service at the office of the United States Attorney for this District. While logic would perhaps suggest that if Weissman testified falsely and with specific intent about what Kenney said, so did Kenney when he testified that he said it. But the government has never charged Kenney with perjury. It specifically declined to do so at the hearing. In response to the Court's question, "Is it the government's view that Mr. Kenney swore falsely on this stand before this Court during this hearing," Tr. 947, the prosecutor contented himself with an expression of "concern" that Mr. Kenney's recollection "was less than accurate," Tr. 948. Expanding upon that view, the government argues in its sentencing brief at 15 that since Kenney testified (without contradiction) that he has frequently entered into joint defense agreements on behalf of clients, Kenney gave an account of the June 16 meeting "colored by the belief that he must have done on this occasion what he has

done on many other occasions, namely, entered into a joint defense agreement." That argument, while perhaps falling short of a petard with which the government is hoist, is at least a two-edged sword, in view of the provisions of Rule 406, F.R. Evid.:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Having considered all the present circumstances of the case, I conclude that the government has not sustained its burden of proof, and decline to make an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1.

### III

As noted, the counts of conviction are Count One (obstruction of justice) and Counts Three and Four (perjury). In the PSR, the Probation Office grouped all three counts together to form one single group for Sentencing Guidelines purposes. Weissman supports that conclusion. The government contends that Counts Three and Four should be separated into two groups, with Count One grouped with either Count Three or Count Four. Specifically, the government suggests "that Count One and Count Three be grouped together, and that Count Four be treated as a separate group." Letter Brief at 17. That contention, if correct, would result in a higher offense level than that computed by the Probation Office, with a consequently higher guideline sentencing range.

Part D of the U.S.S.G., according to its Introductory Commentary, "provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted." The objective of the rules in Part D is "to provide incremental punishment for significant additional criminal conduct." *Id.*

U.S.S.G. § 3D1.2, captioned "Groups of Closely Related Counts," provides in pertinent part:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule . . .

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

Application Note 7 to U.S.S.G. § 3C1.1, which as we have seen deals with obstruction of justice, reads in part:

Where the defendant is convicted both of the obstruction offense and the underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 1D1.2 (Groups of Closely Related Counts).

■ In grouping Counts Three and Four (perjury) together, the Probation Office relied upon U.S.S.G. § 3D1.2(b). In grouping Count One (obstruction of justice). with them, the Probation Office relied upon § 3D1.2(c) and Application Note 7 to § 3C1.1. I think that the Probation Office was right.

The government's brief makes no reference to the U.S.S.G. provisions that I have quoted. In arguing that Counts Three and Four, the perjury counts, should not be grouped, the government relies solely upon U.S.S.G. § 2J1.3(d)(1). § 2J1.3 specifically addresses perjury. § 2J1.3(d)(1) provides:

In the case of counts of perjury or subornation of perjury arising from testimony given, or to be given, in separate proceedings, do not group the counts together under § 3D1.2 (Groups of Closely Related Counts).

Application Note 5 to § 2J1.3 is intended to enlighten the reader as to the meaning of "separate proceedings" as that phrase is used in § 2J1.3(d)(1). It reads:

"Separate proceedings," as used in subsection (d)(1), includes different proceedings in the same case or matter (e.g., a grand jury proceeding and a trial, or a trial and retrial), and proceedings in separate cases or matters (e.g., separate trials of codefendants), but does not include multiple grand jury proceedings in the same case.

The case at bar presents the Court with a typical problem in Guidelines interpretation. As frequently occurs, a Guideline uses a general phrase ("separate proceedings") which the Guideline does not define. Definition is left to the Application Notes, which attempt to enlighten the reader by giving examples, usually preceded (as here) by e.g., the abbreviation of the Latin phrase exempli gratia. But the examples (as here) do not resemble the circumstances of the particular case in question. Frequently the result may fairly be characterized as Delphic, the Guidelines reader being analogized to the pilgrim to the oracle at Delphi, left to decipher as best he can the meaning of the entrails of the sacrificed dove.

The case at bar turns upon the question whether a witness's deposition testimony before a Senate Subcommittee counsel, in a matter under Senate investigation, was given in a "separate proceeding" from the witness's testimony before the Subcommittee itself, on the same matter, eight days later. The government says that these "proceedings" are indeed "separate." That concept would, I think, startle a lay reader, armed only with an understanding of plain English. But these are legal concepts; it is not that simple; and I must consider the examples of "separate proceedings" given in Application Note 5.

The Note says that " 'separate proceedings' . . . includes different proceedings. in the same case or matter," exemplified by "a grand jury proceeding and a trial, or a trial and retrial"; "and proceedings in separate cases or matters," exemplified by "separate trials of codefendants"; but "does not include multiple grand jury proceedings in the same case" (emphasis added). The examples are not intended to be exhaustive. The Delphic note is introduced by the fact that

the Application Note's examples are limited to grand juries and trials, that is to say, the world of litigation, whereas the case at bar involves a Senate investigation, that is to say, the world of legislation.

The government seeks to reinforce its concept of separateness by proffering a letter dated March 13, 1998 which it solicited from Alan Edelman, Esq., counsel to the Subcommittee Minority, who conducted the Weissman depositions and gave cogent and effective testimony at the trial. The government made clear enough to Mr. Edelman the answer it was looking for; Edelman's letter says to the prosecutor that "[y]ou have requested that I address two issues pertinent to application of the Sentencing Guideline," and then quotes the prosecutor's letter of inquiry, which introduced the first issue by asking for Edelman's comments "(1) explaining the differences between compelling Weissman to testify in a deposition format and compelling him to testify at the PSI hearing." Edelman letter at 1.

The government did not ask Edelman to express his view as to whether Weissman's deposition and Subcommittee testimony constituted "separate proceedings" under U.S.S.G. § 2J1.3(d)(1), and perhaps it would not have been fair or appropriate to do so. In any event, Edelman responded to the inquiry as framed by the government by contrasting the purposes and procedures of investigatory depositions, usually conducted in private by Subcommittee staff, and public investigatory hearings before the Subcommittee, in the presence of one or more Senators. Mr Edelman sums the matter up by saying: "Subcommittee staff depositions thus serve a role in the congressional investigatory process not dissimilar from that commonly

4. It is not unfair to cast Weissman in the role of a party defendant in pursuing the civil litigation analogy. As Chief Financial Officer of Empire, he was the officer in charge of the accounting practices and procedures the Subcommittee was investigating. At the Subcommittee hearing, Senator Nunn's questioning of Weissman was printed and, at the end, far from friendly.

5. In order for that precise question to arise, a criminal prosecution would have to be based upon perjury committed during the course of civil litigation. Those prosecutions occur; I have tried such a case. *United States v. Kapoor,*

played by depositions in civil litigation." Edelman letter at 1–2.

The government's letter brief at 17 quotes that analogy, and then, without missing a beat, argues: "By comparison to a criminal case, then, the PSI deposition was analogous to a grand jury proceeding—it was private, investigatory, limited to a single witness, and designed to gather facts." Of course, that is not the analogy that Edelman chose, although he could have done so; presumably he knows what grand juries do. But it is evidence why the government prefers its own analogy; Application Note 5 says that "a grand jury proceeding and a trial" are "separate proceedings" in the context of U.S.S.G. § 2J1.3(d)(1).

I think Edelman's analogy is the better one. Weissman may therefore be analogized to a defendant in a civil case who commits perjury in a pre-trial deposition and then does it again at the trial.[4] I do not know of any case considering whether these stages of a civil case should be considered "separate proceedings" under U.S.S.G. § 2J1.3(d)(1).[5] If such a case were presented to me, with the two instances of the defendant's civil litigation perjury made the subject of separate counts in a criminal indictment, I would be inclined to hold that the counts involved "the same victim" (the plaintiff) and "two or more acts ... constituting part of a common scheme or plan" (depriving the plaintiff of his civil remedy), and group the counts under U.S.S.G. § 3D1.2(b).

Whatever may be the value of these ruminations, when I return to Application Note 5 to § 2J1.3, I think that the example most closely analogous to the case at bar is "multiple grand jury proceedings in the same

93 Cr. 1078 (S.D.N.Y.). But the briefs in the case at bar do not cite any Guidelines authority applicable to the civil litigation analogy articulated by Edelman. The government cites no cases in support of its grouping argument. Weissman collects a number of grouping cases in his brief at 16 n. 12, including one Second Circuit case where perjury and obstruction of justice counts were grouped under U.S.S.G. § 3D1.2(c), *United States v. Jones,* 900 F.2d 512, 518 (2d Cir.1990), but none construes the "separate proceedings" provision of § 2J1.3(d)(1).

case," which the Note instructs do not constitute "separate proceedings." That is because a grand jury and a congressional committee such as the PSI are both fact-finding, investigative bodies. The differences between staff depositions and committee hearings, described by Mr. Edelman in his letter, relate solely to differences in the stages of a congressional investigatory process. The purposes of the investigations differ: the grand jury considers whether an individual should be indicted; the congressional committee considers whether remedial legislation should be introduced. But the functions of both bodies are investigative in nature; neither body determines the ultimate facts in a contested case, as does a trial jury; and I take that to be the consideration, albeit unarticulated, that led the Sentencing Commission to conclude in Application Note 5 that "a *grand jury proceeding and a trial*" are "separate proceedings" under § 2J1.3(d)(1).

For these reasons, I conclude that the Probation Office correctly grouped the counts in the case at bar, and reject the government's contention that Counts Three and Four should not be grouped.

### IV

Lastly, the government argues for a three-level *upward adjustment for substantial interference with the administration of justice.*

That argument is advanced with respect to Count I (obstruction of justice) and Count III (Weissman's perjury during the June 22, 1993 staff deposition).

The government's argument is based upon identical provisions in U.S.S.G. § 2J1.2 (obstruction of justice) and U.S.S.G. § 2J1.3 (perjury). § 2J1.2(b)(2) and 2J1.3(b)(2) both provide:

If the offense resulted in substantial interference with the administration of justice, increase by 3 levels.

Application Note One of each section provides:

"Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

Because Weissman's conduct occurred within the context of a congressional inquiry, rather than a criminal investigation or a judicial proceeding, the only circumstance specified in the Application Notes pertinent to the case at bar is "the unnecessary expenditure of substantial governmental or court resources." It is this provision upon the government relies. Its contention is that Weissman's obstruction of justice in altering certain Subcommittee-subpoenaed documents and failing to produce others caused "the unnecessary expenditure of substantial" Subcommittee resources, as did Weissman's perjurious testimony at the June 22 deposition.[6] If the government is to succeed on this claimed enhancement, upon which it bears the burden of proof by a preponderance of the evidence, this Court must be in a position, on the whole record, to make specific findings that Weissman's conduct resulted in "substantial expenditure of governmental resources." *United States v. Jones,* 900 F.2d 512, 521–22 (2d Cir.1990).

The Guidelines do not further define the adjective "substantial." "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Adames,* 901 F.2d 11, 12 (2d Cir.1990) (citing and quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

---

**6.** While the indictment contained three perjury counts, the government argues for this enhancement only with respect to Count Three. The jury failed to reach a verdict on Count Two (alleged perjury during the June 11, 1993 deposition.) Count Four relates to Weissman's testimony before the Subcommittee itself. While the jury convicted Weissman on two of the four specifica-

tions in that count, the government's assertion of "unnecessary expenditure of substantial governmental … resources" focuses upon the activities of the Subcommittee staff in investigating the conduct of Empire's business and preparing for the June 30, 1993 Subcommittee hearing, chaired by Senator Nunn.

Webster's Deluxe Unabridged Dictionary (2d ed.1979) at p. 1817 defines "substantial" as "of considerable size or amount." The word's antonym, "insubstantial," is defined as "not substantial; specifically, (a) unreal; imaginary; (b) not solid or firm; weak or flimsy." *Id.* at 952.

The Random House Dictionary of the English Language (College ed., 1969) at p. 1310 defines "substantial" as "of ample or considerable amount, quantity, size, etc.," and "insubstantial" as "not substantial; slight." *Id.* at 691.

Webster's Dictionary of Synonyms (1942) gives the synonyms of "substantial" as "massive, massy, bulky, monumental," and the adjective's antonyms as "airy, ethereal."

■ Each case depends on its own circumstances. The precedential value of any particular case is limited. Contrary to one of Weissman's arguments, "[t]he government need not particularize a specific number of hours expended by government employees." *Jones,* 900 F.2d at 522. The Second Circuit in *Jones* went on to observe that "when the defendant has concealed evidence and is the only known source of information, substantial interference with the administration of justice may be inferred." *Id.*

In *Jones,* upon which Weissman places principal reliance, the Second Circuit reversed the district court's imposition of a sentencing enhancement because there was no evidence that the perjured testimony in question caused any unnecessary governmental expenditures. That is apparent from the court of appeals' discussion at 900 F.2d 522:

> The government urges such an inference here, but Jones produced in the district court, in the form of Hale's testimony and the government's application for a search warrant for Princeton/Newport's offices, substantial evidence that the government already had the information Jones concealed. In the absence of any showing of evidence concealed by Jones and not already known by the government, we cannot conclude that unnecessary expenditures have been established by a preponderance of the evidence.

Weissman finds comfort in the *Jones* court's statement that the perjurious statements in that case "do not constitute the type of egregious conduct envisioned by the Guidelines as substantial interference with the administration of justice." 900 F.2d at 522. When one reads the quoted language in context, it is not clear that the Second Circuit was applying the adjective "egregious," which modifies the nature of conduct, to quantifying the consequences of that conduct, the decisive test in determining whether a defendant's conduct resulted in "the unnecessary expenditure of substantial governmental resources." the provision upon which the government relies in the case at bar. In *Jones* the district court relied upon all three of the examples of administration of justice set forth in Application Note 1; the Second Circuit concluded at 900 F.2d 522:

> As we have indicated, no such expenditures have been demonstrated. Moreover, these instances of perjury, standing alone, do not constitute the type of egregious conduct envisioned by the Guidelines as substantial interference with the administration of justice. Accordingly, the sentence imposed must be vacated.

Perjury, one would think, constitutes egregious conduct by definition; certainly it is wrongful; and I read the *Jones* decision to hold that if the government had proved that the perjury in question caused the unnecessary expenditure of substantial governmental resources, the district court's enhancement would have been affirmed, without it being necessary to reflect upon whether the perjury was "egregious."

*Jones* may be contrasted with *United States v. DeSalvo,* 26 F.3d 1216 (2d Cir.1994), upon which the government relies. The case involved criminal conduct by two attorneys, DeSalvo and one Eisen, who were law partners. Following DeSalvo's conviction, the district court imposed a 3–level enhancement on the ground that perjury committed by DeSalvo "resulted in substantial interference with the administration of justice" because it resulted in "the unnecessary expenditure of substantial court resources." On appeal the defendant relied upon *Jones* to avoid the

enhancement, but the Second Circuit distinguished *Jones*, stating at 26 F.3d at 1224:

> Judge Sifton made sufficient factual findings on the record at sentencing. Judge Sifton presided over the Eisen trial, and explained that his findings reflected not only the expenses associated with DeSalvo's trial but also the expenditures associated with the Eisen trial. Without doubt, truthful and complete testimony by DeSalvo—who was the second highest ranking lawyer with the Eisen firm and a trial lawyer on cases which were the subject of several counts in the Eisen indictment—would have saved the government substantial investigation and trial expenses. Because Judge Sifton's conclusion was amply supported by the record, there is no basis to vacate the sentence.

*Jones* and *DeSalvo* appear to be the two Second Circuit cases most directly in point. As I read these decisions, *Jones* holds that if the government cannot prove any unnecessary expense resulting from a defendant's perjury, it cannot succeed on a theory of enhancement which depends upon the existence of a "substantial" amount of unnecessary expense. *DeSalvo* holds that additional investigative and trial expenses caused by defendant's perjury, incurred not in one criminal trial but in two, entitled the district court to conclude that the unnecessary expenses were "substantial." In short: nothing is not substantial, but a great deal is. These decisions are of course instructive, but only up to a point.

I also find instruction in the Tenth Circuit's discussion and collection of cases in *United States v. Sinclair*, 109 F.3d 1527, 1539–40 (10th Cir.1997):

> Other circuits have also concluded that substantial interference with the administration of justice may be inferred if the defendant concealed information of which he is the only known source. *See United States v. Bradach*, 949 F.2d 1461, 1463 (7th Cir.1991); *Jones*, 900 F.2d at 522. Howev-

er, decisions affirming the three-level enhancement of the offense level under U.S.S.G. § 2J1.3(b)(2) have generally involved government and court expenditures significantly more extensive than those listed in Mr. Sinclair's presentence report. *See United States v. Atkin*, 29 F.3d 267, 268 (7th Cir.1994) (government required to summon five additional grand jury witnesses from many miles away); *United States v. Butt*, 955 F.2d 77, 88 (1st Cir. 1992) (government required to locate and examine several more witnesses and to immunize persons whom it might have otherwise prosecuted); *Bradach*, 949 F.2d at 1463 (false testimony impaired the grand jury proceedings and necessitated four perjury related trials in three years); *United States v. Lueddeke*, 908 F.2d 230, 234 (7th Cir.1990) (FBI spent two full weeks trying to sort out the truth).

■ While the Second Circuit held in *Jones* that the government "need not particularize a specific number of hours expended by government employees" to prove the basis for an enhancement for interference with the administration of justice, one may deduce from these appellate cases the elements that the government must prove to justify an enhancement on the particular theory advanced in the case at bar. Specifically, the government must (1) identify a particular expenditure of governmental resources (time or money) (2) which but for the defendant's conduct would not have been expended[7] and (3) was "substantial" in amount, as that adjective is used in common parlance.

To establish these elements in the instant case, the government must rely exclusively upon Alan Edelman, the staff counsel upon whose investigatory efforts Weissman's criminal conduct directly impacted. I have read Edelman's trial testimony and his letter to the prosecutor dated March 13, 1998, "detailing the effect of Weissman's failure to comply with the PSI subpoenas and/or his perjurious testimony on the PSI's expenditure of resources."[8]

---

7. That element gives meaning to the requirement in the Application Notes that the expenditure of resources be "unnecessary."

8. Edelman's letter is again quoting from the prosecutor's letter posing the questions for Edelman to address.

Two preliminary points must be made about Edelman's declarations. First, in his trial testimony and again in his letter, Edelman said that as the result of Weissman's withholding of Empire's market segment reports, the Subcommittee staff did not conduct certain inquiries that it might otherwise have done. The letter states at 2:

> In addition, the withholding of responsive documents precluded the staff from pursuing potentially significant lines of inquiry. For example, had Empire's market segment reports been produced to the Subcommittee in accordance with the subpoena, the staff might have investigated a number of additional questions, including 1) why the market segment results were different from the results reported by Empire on its annual Insurance Blanks; 2) whether Empire was reporting different results in order to conceal something from the Insurance Department and the public or for some other purpose; and 3) to what extent the insurance Department was aware of a difference between the results reported on the Blanks and those shown in the market segment reports. *See* Tr. At 3499–3502. The last-minute production of these documents left the staff with little over one week before the Subcommittee's hearings within which to pursue these important and complex issues.

I have no reason to doubt Edelman's assertions, or his conclusion at the end of the letter that Weissman's obstruction and false testimony "also precluded the effective use of [the Subcommittee's] resources on potentially significant areas of concern to the Subcommittee." Undoubtedly Weissman intended just that sort of derailing of the investigation when he withheld subpoenaed documents from the Subcommittee and lied at his deposition. Such cause and effect considerations go to Weissman's underlying convictions. But they do not demonstrate an *expenditure* of Subcommittee resources, which is required for an administration-of-justice enhancement for the underlying offense. Edelman is explaining why, in these particular respects, Weissman's obstruction caused the Subcommittee staff to do less, not more. That is not to excuse Weissman's conduct. It only means that the preclusion of pursuit of other lines of inquiry is not relevant to the theory of enhancement the government urges.

Secondly, it is necessary to remember that the jury did not convict Weissman on all the specifications under Count One or Count Three. The jury was instructed to return its verdict in the form of special interrogatories to avoid any confusion on that score. On Count One, the jury convicted Weissman of altering one of three specified subpoenaed documents, but failed to convict on the other two; it also convicted Weissman for failing to produce all the specified documents in that portion of the Count. On Count Three, eleven specifications of perjury were submitted to the jury, which convicted Weissman on three of them and failed to convict on the other eight. Obviously, in its effort to draw a causal connection between Weissman's conduct and the expenditure of Subcommittee resources, the government is limited to the specifications of conviction.

On Count One, the jury convicted Weissman for causing Empire not to produce "financial results by market segment contained in the black books during the years 1989 to 1992." The concept of market segments lay at the heart of the case. A word of explanation is necessary.

Empire is state-regulated, nonprofit health insurance company, and the "insurer of last resort" for New York City. The policies issued by Empire in that capacity, to individuals, families, and small businesses, formed, in the parlance adopted by Empire, the "community-rated" segment of its business. The premiums Empire charged in the community-rated segment were monitored by the New York State Insurance Department ("NYSID"). Empire also provided insurance to large companies, functioning in that respect more like a private health insurance company. That activity was referred to as the "experience-rated" segment of Empire's business.

Empire was required to file periodic financial figures with the NYSID which distinguished between the results achieved in these two segments. Those filings were referred to as the "Blanks." It was generally expected that the experience-rated segment

would generate substantial revenues, offsetting less favorable figures ascribable to the community rated-segment. However, during Weissman's tenure as Empire's CFO, Empire was losing substantial amounts of money on the experience-rated segment of its business. To conceal that unfavorable experience, Weissman changed the numbers reported to the NYSID in the Blanks by shifting losses from the experience-rated segment to the community-rated segment.

True depictions of the financial results by market segment were contained in periodic internal Empire financial reports, filed in a binder known as "the Black Books" (one for each year). Those records, clearly covered by the subpoena, Weissman withheld from the Subcommittee, as the jury found by its verdict.

These insurance accounting and reporting concepts are complex, and difficult for the lay person to comprehend. A conscientious trial jury listened attentively to weeks of testimony that would have caused the eyes of less dedicated citizens to glaze over. More to the present point, Edelman and his Subcommittee staff were challenged by the need to understand Empire's records and the discrepancies they contained. In that area of inquiry, the "Black Books," had they been made available to the Subcommittee, would have performed the function of the Rosetta Stone.

Accordingly it is not surprising to read in Edelman's letter:

> Mr. Weissman's obstruction and false testimony resulted in the expenditure of significant time and effort by members of the Subcommittee staff, including myself. One of the main focuses of the Subcommittee's investigation of Empire (and one in which I was personally involved) was to understand why Empire had been reporting such large losses for a number of years. Empire blamed the losses on what it termed "cherry picking"—the luring away of Empire's best risks by for-profit insurance companies. At the same time, those for-profit insurance companies blamed the losses on Empire's own mismanagement, particularly within Empire's experience-rated lines of business. As I testified at trial, Mr. Weissman's withholding and alternation of responsive documents required the staff to consume significant resources attempting to analyze Empire's financial condition and appreciably impeded our ability to determine which explanation was correct.

I accept that equally plausible assessment.

As for perjury, the three specifications of conviction under Count Three are numbers (iii), (vii), and (viii). I will consider them in order.

Specification (iii) quotes Weissman's testimony that "in 1992, there are no adjustments between the internal report and the external report, and that is a byproduct of a comment in the Deloitte & Touche management letter for the year-end 1991 financial statement."

Specification (vii) quotes Weissman's testimony that, in signing off on certain market-segment reallocations reported in one of the Blanks, "I believe that I had no problem. after making the second set of reallocations to attest to the fact that I thought the numbers were still reasonable ... On further reflection, I felt that the numbers that I was putting into the Blank were accurate, I didn't have any problem."

Specification (viii) quotes Weissman's testimony that, in response to NYSID auditors' requests for market segment information, "[w]e had to create special work sheets for that, we didn't have the work sheets prepared as they requested, and we have given them, as far as I know, whatever they have asked for with respect to market segment information on national account business."

The jury found that all this testimony was perjurious. Each answer relates to market segment accounting and the documents relating to that subject, such as the Black Books. Truthful answers would have accelerated the staff's understanding of the real nature of Empire's financial results—an understanding that Weissman's false testimony was clearly intended to frustrate. This false testimony is of a piece with Weissman's failing to make timely disclosure of the Black Books; it was not until June 21, the day before Weissman's second day of deposition, that Edelman received a few pages of market segments re-

ports, and the Subcommittee never received a single complete Black Book for the years in question. Edelman Trial Tr. 3726.

In these circumstances, I regard as equally plausible Edelman's statement in his letter at 2:

> Mr. Weissman's false deposition testimony similarly frustrated the staff's preparation for the Subcommittee's hearings, requiring us to continue to investigate, to search for and interview additional witnesses, and to rewrite our staff statement for the hearings up until the very morning of the hearings.

On this evidence, I find that Weissman's withholding of subpoenaed documents, viewed in conjunction with his false testimony, caused the Subcommittee to expend additional time in attempting to understand Empire's books, records, and business performance, which but for defendant's criminal conduct would not have been necessary, and which was substantial in amount. The elements of the administration-of-justice enhancement are thus established. Weissman's brief stresses that the government has not precisely quantified the amount of time involved, but under *Jones* it does not need to do so.

### V

It follows that the offense level in this case is 12, plus a 3–level enhancement for substantial interference with the administration of justice, for a total adjusted offense level of 15. Weissman's criminal history category is I.

The Sentencing Guideline range is accordingly 18 to 24 months. Decision is reserved to the sentencing hearing as to whether there should be an upward or downward adjustment, and as to where, in the ultimately determined range, the sentence should fall.

It is SO ORDERED.