Terrance Y. YOSHIKAWA; Ko
Securities, Inc., Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

No. 98–70150.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1999.

Decided Aug. 20, 1999.

Tolan S. Furusho, Bellevue, Washington, for petitioners.

Angel Yang, Office of General Counsel, Securities and Exchange Commission, Washington, D.C., for respondent.

Before: BEEZER, WIGGINS and KLEINFELD, Circuit Judges.

BEEZER, Circuit Judge:

Petitioners Terrance Yoshikawa and Ko Securities, Inc. (collectively, "Yoshikawa") appeal an order of the Securities and Exchange Commission ("SEC") holding that Yoshikawa violated Article III, Section 1 of the National Association of Securities Dealers ("NASD") Rules of Fair Practice.[1] The SEC's order is founded on its factual finding that five discrete sets of securities transactions executed by Yoshikawa constitute securities "parking." We have jurisdiction pursuant to 15 U.S.C. § 78y(a)(1). As to the first transaction set, we remand to the SEC for further factual findings and conclusions. As to the remaining four transaction sets, we reverse the SEC's order.

## I

The facts in this case are essentially undisputed. Ko Securities, Inc. ("Ko") is a member of the NASD. Terrance Yoshikawa is Ko's president, director and sole shareholder. We consider five separate sets of securities sales and purchases undertaken by Ko, at Terrance Yoshikawa's direction, between December 1991 and December 1993. Three accounts were involved, all of which were solely owned and controlled by Terrance Yoshikawa: (1) Ko's proprietary account ("Inventory Account"); (2) Terrance Yoshikawa's personal trading account ("Trading Account"); and (3) Terrance Yoshikawa's individual retirement account ("IRA"). These transactions all involved the common stock of DDI Pharmaceuticals, Inc. ("DDIX") and were effected to ensure that Ko's net capital remained above both the SEC's requirement during that time of $30,000,[2] see 17 C.F.R. § 240.15c3–1, and Paine-Webber's (Yoshikawa's clearing firm) requirement of $100,000.

The transactions occurred as follows:

(1) On December 30, 1991, the Inventory Account sold 14,500 shares of DDIX to the IRA at a price of 6 ⅛. On January 2, 1992, the Inventory Account purchased 14,500 shares of DDIX (in two separate transactions) from the IRA at a price of 6 ½.

(2) On March 13, 1992, the Inventory Account sold 79,000 shares of DDIX to the Trading Account at a price of 7 ⅛. On March 16, 1992, the Inventory Account purchased 79,000 shares of DDIX from the Trading Account at a price of 3.

(3) On March 16, 1992, the Inventory Account sold 75,000 shares of DDIX to the IRA at a price of 3. The Inventory Account purchased from the IRA 40,000 shares of DDIX at a price of 3 ⅝ on

---

**1.** Article III, Section 1 of the NASD's Rules of Fair Practice is now known as NASD Conduct Rule 2110.

**2.** In July 1994, Ko's net capital requirement was raised to $50,000.

March 17, 5,000 shares of DDIX at a price of 3 on March 18 and 30,000 shares of DDIX at a price of 3 ⅝ on March 19.

(4)-(5): (4)—On December 7, 1993, the Inventory Account sold 35,825 shares of DDIX to the IRA at a price of 4 ¼. (5)—On December 14, 1993, the Inventory Account purchased 20,000 shares of DDIX from the IRA at a price of 3. (4)—On December 15, 1993, the Inventory Account purchased 36,581 shares of DDIX from the IRA at a price of 2 ¾. (5)—On December 17, 1993, the Inventory Account sold 20,000 shares of DDIX to the IRA at a price of 3 ⅝.

At the end of every month, Ko was required to file with the NASD and the SEC a Financial and Operational Combined Uniform Single ("FOCUS") Part I Report setting forth Ko's net capital position. *See* 17 C.F.R. § 240.17a–5. Ko was also required to file the FOCUS Reports with PaineWebber. In calculating its net capital, Ko was not allowed to credit the prevailing market value of the DDIX stock held in its own account. Instead, Ko was required to take an appropriate deduction, or "haircut," from the market value of the DDIX stock that it owned.[3]

Following an NASD investigation, NASD's Market Surveillance Committee issued a formal complaint against Yoshikawa in May 1995. The complaint alleged that Yoshikawa had arranged to conceal the true ownership of DDIX on at least five occasions in order to reduce the risk of, or to prevent, Ko from falling below the minimum net capital requirements set by the SEC and/or PaineWebber. In its answer, Yoshikawa admitted executing the trades to prevent Ko from experiencing net capital problems, but denied violating any NASD rules.

After conducting a hearing, the NASD found in May 1996 that Yoshikawa had arranged through the securities transactions at issue to conceal the true ownership of DDIX "in order to reduce the risk of, or to prevent, [Ko] from falling below the minimum net capital requirements set by the [SEC] and/or its clearing firm, Paine-Webber, Incorporated." Although the NASD dismissed all allegations of fraud, it concluded that Yoshikawa had illegally "parked" the stock in Terrance Yoshikawa's personal accounts and had overstated Ko's net capital position. The NASD held that Yoshikawa's conduct violated Article III, Section 1 of the NASD's Rules of Fair Practice, which require members and their associated persons "in the conduct of [their] business, [to] observe high standards of commercial honor and just and equitable principles of trade." *NASD Manual* (CCH) ¶ 2151 at 2014 (1995) ("NASD Rules"). The NASD censured Yoshikawa, fined Yoshikawa $10,000 (jointly and severally between Terrance Yoshikawa and Ko), suspended Ko from proprietary trading and market-making for 20 business days and required Terrance Yoshikawa to attend a "compliance conference" with the NASD's Market Surveillance staff.

Yoshikawa appealed the NASD's decision to the National Business Conduct Committee ("NBCC"). The NBCC held a hearing on the matter and, on January 22, 1997, affirmed the NASD's decision in all respects, with the single exception of decreasing Ko's suspension from proprietary trading and market-making from 20 to 5 business days.

---

**3.** When calculating its net capital, a broker-dealer must deduct 15% of the market value of the greater of its long or short equity position. If the smaller of the long or short equity position exceeds 25% of the greater position, a broker-dealer must also take a deduction of 15% of the market value of that smaller position. If a broker-dealer holds a single class of securities of any issuer that has a market value of more than 10% of the broker-deal-

ers's net capital, before certain adjustments, the broker-dealer must also take a so-called "Undue Concentration" deduction. *See* 17 C.F.R. § 240.15c3–1(c)(2)(vi)(J), (M). As explained in the NBCC's decision in this case, "[i]n computing a broker/dealer's net capital, a deduction must be taken from the market value of securities owned by the firm. These deductions, which are part of the firm's aggregate indebtedness, are called 'haircuts.' "

■ On February 21, 1997, Yoshikawa appealed to the SEC. On December 11, 1997, the SEC issued an order, following a de novo review of the record, affirming the holding of the NBCC and the NASD. In particular, the SEC held that Yoshikawa violated NASD Rules by "parking" DDIX stock:

> We agree with the NASD that applicants' conduct constituted what is commonly known as "parking," and is inconsistent with just and equitable principles of trade. Applicants have admitted that these trades were done to shift losses or anticipated losses out of the Inventory Account and to avoid haircuts that otherwise would have been required. Applicants' actions thereby alleviated actual or perceived problems for the Firm with its net capital requirements or [PaineWebber's] "guideline" that Ko maintain net capital of $100,000. Applicants' actions had the effect of inflating the Firm's net capital, misleading or potentially misleading the Commission, the NASD and other regulatory authorities, as well as [PaineWebber] about the true state of Ko's finances. Applicants' actions created a false and misleading picture of Ko's financial situation.

This timely appeal of the SEC's order followed.[4]

## II

■ We address the question whether any of Yoshikawa's charged conduct amounts to securities "parking." We review for substantial evidence the SEC's factual finding that Yoshikawa "parked" securities. *See Whiteside & Co. v. SEC,* 883 F.2d 7, 9 (5th Cir.1989). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

## III

We have described conduct constituting securities "parking" as follows:

> [s]tock "parking" is a mechanism used to evade the net capital requirements of the [NASD]. When a brokerage firm files the required monthly report with the NASD regarding its net capital condition, it must discount (or take a "haircut" on) the value of any stock it holds in its own account. To reach technical compliance with its net capital requirements, a brokerage firm "sells" stock from its own account to a customer at market price. This avoids the discount for reporting purposes. Once the brokerage firm has filed its report with the NASD and met its net capital requirement, it then "buys" the shares back from the customer, usually at the same price at which it "sold" the stock, plus interest.

*Securities Investor Protection Corp. v. Vigman,* 74 F.3d 932, 933 n. 3 (9th Cir. 1996).

In a case involving "parking" to obtain false tax losses, the Second Circuit defined "parking" as

> a purported transfer of ownership in securities combined with a secret agreement providing the "seller" with the right to repurchase them at a later date. The "seller" receives the tax benefits of a loss realized by the "sale"; the "buyer" is compensated for the "cost of carrying" the securities. Since the agreement to resell ensures that the "seller" never loses control of the securities, the government considers "parking" a form of tax and securities fraud.

*United States v. Jones,* 900 F.2d 512, 515 (2nd Cir.1990). The Seventh Circuit has described "stock parking" as an arrangement in which "shares of stock are held by someone other than the true owner for the purpose of lowering the apparent amount of stock owned by that person." *Champi-*

---

4. We review the SEC's order, not the order of the NASD. *See* 15 U.S.C. § 78y(a)(1); *Eichler*

*v. SEC,* 757 F.2d 1066, 1069 n. 2 (9th Cir. 1985).

*on Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1005 (7th Cir.1989); *cf. Whiteside,* 883 F.2d at 9 ("parking" involves "purported" sales to another account).

"Parking" has been characterized by the SEC as "the sale of securities subject to an agreement or understanding that the securities will be repurchased by the seller at a later time and at a price which leaves the economic risk on the seller." *In re Barlage,* 63 S.E.C. 1060, 1996 WL 733756, at *1 n. 2 (S.E.C.1996). In an earlier case, the SEC defined "parking" as

> a transaction whereby a broker-dealer purports to sell securities to a customer (which securities do not have sufficient market value at the time to avoid a substantial "haircut" with respect to net capital and aggregate indebtedness computations), with the understanding, oral or written, that the customer will hold the securities for a stipulated time (usually over the time when the broker-dealer is required to prepare and file its net capital and aggregate indebtedness computations), at which time the broker-dealer will repurchase said securities, and in connection with which the broker-dealer does not record on its books and records the fact of its repurchase obligations.

*In re Hibbard & O'Connor Sec. Inc.,* 46 S.E.C. 328, 1976 WL 20109, at *2 (S.E.C. 1976). Stratagems of this character are, in the SEC's view, "clearly incompatible with the observance of just and equitable principles of trade." *In re Whelen & Co., Inc.,* 50 S.E.C. 282, 1990 WL 312067, at *2 (S.E.C.1990).

"Parking" transactions are multifariously described in the caselaw as "contrived transactions designed to remove securities from the firm's inventory in order to avoid the required haircuts," *In re Whiteside,* 49 S.E.C. 963, 1988 WL 240333, at *2 (S.E.C. 1988), "a purported transfer of ownership in securities combined with a secret [repurchase] agreement," *Jones,* 900 F.2d at 515, "sham transactions," *In re Cotzin,* 45 S.E.C. 575, 1974 WL 11424, at *2 (S.E.C. 1974); *Whelen,* 1990 WL 312067, at *2, "not in fact bona fide purchases," *In re Capital Sec. Co.,* 43 S.E.C. 758, 1968 WL 3996, at *2 (S.E.C.1968), a "deceptive device to overstate [a] firm's net capital position," *id.,* or a "scheme," *In re Schellenbach,* 50 S.E.C. 798, 1991 WL 288493, at *1 (S.E.C.1991), used "to circumvent net capital requirements," *Whiteside,* 1988 WL 240333, at *4; *accord Capital Sec.,* 1968 WL 3996, at *2.[5]

Often, other aggravating factors are also present that further substantiate the SEC's finding of "parking," such as check kiting, *see Schellenbach,* 1991 WL 288493, at *2; *Capital Sec.,* 1968 WL 3996, at *2, asymmetrical settlement dates, *see Whiteside,* 1988 WL 240333, at *2 (settlement for "sale" same-day, whereas settlement for "repurchase" some days later), use of inactive or fictitious accounts, *see In re Amsel,* 61 S.E.C. 1807, 1996 WL 169430, at *1 (S.E.C.1996), or inaccurate record-keeping, *see Whelen,* 1990 WL 312067, at *2; *In re Mercer,* 8 S.E.C. 264, 1975 WL 12329, at *1 (S.E.C.1975); *Whiteside,* 1988 WL 240333, at *4. In some cases, the SEC's burden was greatly simplified by the fact that respondents outright admit-

---

**5.** Although "parking" transactions are frequently motivated by net capital concerns, it bears noting that "parking" can also occur for other reasons. *See, e.g., Amsel,* 1996 WL 169430, at *2 ("parking" scheme used to keep trading positions flat); *Capital Sec.,* 1968 WL 3996, at *2 (securities parked because president of NASD firm "unable to ascertain the firm's financial condition" and "to show realized profits on securities transactions"); *Abruscato,* 1966 WL 3996, at *2 (because no

net capital risk in this case, "parking" trades likely executed "to create a better appearance in the trading account at ... month-end dates"); *see generally Whelen,* 1990 WL 312067, at *2 ("While [parking] transactions are usually utilized to circumvent net capital requirements, no such purpose is necessary to establish a violation of NASD rules."). The idea is that, even where a firm is at no risk of violating the net capital rules, "parking" can nevertheless distort a firm's financial picture.

ted the "parking" violations. *See, e.g., Amsel,* 1996 WL 169430, at *1 ("Amsel admits . . . the scheme involving the parking of stock"); *Whiteside,* 1988 WL 240333, at *3 (respondents admitted "sham transactions" were executed "so we [the firm] don't have to take the haircut on them [the securities at issue]"); *Cotzin,* 1974 WL 11424, at *2 ("applicants admittedly engaged in the sham transactions" to circumvent required haircuts and avoid net capital deficiencies); *In re Higgs,* 45 S.E.C. 318, 1973 WL 12524, at *2 (S.E.C. 1973) (respondents admitted "parking" scheme, stating merely that "they did not know that 'parking' transactions were an improper method of improving net capital"); *In re Abruscato,* 43 S.E.C. 318, 1966 WL 3148, at *1 (S.E.C.1966) ("Applicant did not deny any of these [parking] transactions," instead claiming that they were executed at the direction of a supervisor).

## IV

■ Based on our review and analysis of the "parking" caselaw, we conclude that securities "parking" is, at a minimum, comprised of the following elements:

(1) a pre-arrangement to sell and then buy back securities (to conceal true ownership);

(2) on the same, or substantially the same, terms (thus keeping the market risk entirely on the seller);

(3) for a bad-faith purpose,[6] accomplished through a sham transaction in which nominal title is transferred to the purported buyer while the economic incidents of ownership are left with the purported seller.

## V

Although it presents a close call, the administrative record may contain substantial evidence that Yoshikawa engaged in securities "parking" in connection with

the trades occurring between December 30, 1991 and January 2, 1992 ("Transaction Set 1"). For Transaction Sets 2–5, however, there simply is not substantial evidence in the administrative record to support the SEC's finding of securities "parking."

We describe the specific facts of each transaction set in turn. We then weigh those facts against the definition of securities "parking" set out in Section IV. Subsection A will discuss Transaction Set 1 exclusively; subsection B will then address Transaction Sets 2–5.

## A—TRANSACTION SET 1

### 1—Facts

*Transaction Set 1*

(1) *On December 30, 1991, the Inventory Account sold 14,500 shares of DDIX to the IRA at a price of 6 ⅛. On January 2, 1992, the Inventory Account purchased 14,500 shares of DDIX (in two separate transactions) from the IRA at a price of 6 ½.*

■ In his answer to the NASD complaint, Terrance Yoshikawa states that the December 30 "transaction was made in order to keep my net capital above the $100,000 guideline set by my clearing broker PaineWebber." In an August 2, 1994 letter drafted by his then-attorney ("8/2/94 Letter"), Terrance Yoshikawa claims that "the purpose of [the January 2] transaction was merely *to return* shares to the Ko inventory account, after other securities had been sold by the Ko inventory account in sufficient amount to assure compliance with the PaineWebber agreement." (emphasis supplied)

### 2—Analysis

Of all the trades at issue, the evidence surrounding Transaction Set 1 comes clos-

---

**6.** The inference of bad faith will frequently be supported by evidence that the securities transaction at issue took place above the pre-

vailing market price, and/or that it occurred just prior to a net capital computation deadline (normally at the end of the month).

est to providing substantial evidence for a finding of "parking." For example, Terrance Yoshikawa states that the January 2, 1992 trades were effected to "return" the DDIX shares to the Inventory Account. This statement, considered along with the fact that Transaction Set 1 occurred at month-end, just prior to Ko's net capital computation deadline, may suggest the presence of a bad-faith scheme in which Terrance Yoshikawa had prearranged (in his own mind) for the Inventory Account to repurchase the DDIX shares after only temporarily leaving them in the IRA at month-end for purposes of Ko's net capital computation.[7] If true, this would demonstrate the presence of definitional elements (1) and (3).

Outside the fact that the trades in Transaction Set 1 were executed at the going market price, the administrative record also arguably contains evidence of other typical features of "parking." In particular, the fact that the December 30, 1991 sale price and the January 2, 1992 purchase price differed by only 6% may support a finding that these trades took place on substantially the same terms. This could establish the presence of definitional element (2).

On remand, the SEC will need to review carefully the administrative record to determine whether Transaction Set 1, when viewed in isolation, amounted to a sham designed to conceal the true ownership of the DDIX shares and thereby to avoid impermissibly a required net capital deduction. If supported by substantial evidence, such a conclusion would substantiate a finding of "parking"; if such a conclusion is unsupported by substantial evi-

dence, it would follow that Yoshikawa did not engage in securities "parking."

## B—TRANSACTION SETS 2–5

### 1—Facts

#### *Transaction Set 2*

(2) *On March 13, 1992, the Inventory Account sold 79,000 shares of DDIX to the Trading Account at a price of 7 ⅛. On March 16, 1992, the Inventory Account purchased 79,000 shares of DDIX from the Trading Account at a price of 3.*

Following news that phase III clinical trials of DDIX had failed to gain FDA approval, Yoshikawa anticipated a drop in the stock price. The Inventory Account sold 79,000 shares of DDIX to the Trading Account to avoid a net capital problem in the Inventory Account. Terrance Yoshikawa stated in the 8/2/94 Letter that "[t]he reason for the sale was that a significant decrease in the value of the stock would jeopardize the minimum net capital requirement of Ko Securities; therefore, the need to sell the shares." Had the 79,000 shares been left in the Inventory Account, Terrance Yoshikawa testified that net capital "would have been a negative 245,000 [dollars].... I bought that trade so that it would—basically so I wouldn't have a net capital violation.... I knew I had to buy that trade from starting early in the morning and I would have to buy it personally to stay in business." On the same day, the Inventory Account bought 29,000 shares of DDIX in 16 separate trades from other market-makers, and sold 84,200 shares of DDIX in 34 separate trades to other market-makers.

On March 16, the Trading Account sold 79,000 shares of DDIX to the Inventory

**7.** It does not appear that the SEC undertook any explicit inquiry into the existence *vel non* of a pre-arrangement to sell and then repurchase DDIX. Rather, the SEC simply presumed that "Yoshikawa's control of all three accounts made a prearrangement unnecessary." We acknowledge that the nature and quanta of proof necessary for finding a pre-

arrangement will depend on whether one or several individuals are involved in an alleged "parking" scheme. However, because we hold that a finding of "parking" requires the presence of a pre-arrangement to sell and then buy back securities, the SEC erred in failing to make a finding on this question.

Account. In his answer to the NASD's complaint, Terrance Yoshikawa stated that he executed this trade "because [his] personal account now had a large margin call [in the amount of $239,350] ... [and] the stock could no longer be margined." Terrance Yoshikawa testified: "As soon as I put [the March 13] trade into my personal account, I had a margin call on my personal account which I had to take care of." He further testified that this transaction "helped the margin call because [the Trading Account] needed cash." As a result of this trade, the Trading Account lost $325,-000.

*Transaction Set 3*

(3) *On March 16, 1992, the Inventory Account sold 75,000 shares of DDIX to the IRA at a price of 3. The Inventory Account purchased from the IRA 40,000 shares of DDIX at a price of 3 ⅝ on March 17, 5,000 shares of DDIX at a price of 3 ½ on March 18, and 30,000 shares of DDIX at a price of 3 ⅜ on March 19.*

Uncertain as to what the market would do, Yoshikawa sold 75,000 shares of DDIX from the Inventory Account to the IRA on March 16. Terrance Yoshikawa stated through his then-attorney in an August 22, 1994 letter ("8/22/94 Letter") that "he did not want to take any further declines in either his personal account or the Ko inventory account." Terrance Yoshikawa testified that he knew, following the March 16 sale from the Trading Account to the Inventory Account, that he would sell the DDIX shares again, this time to the IRA. This cross-trade was executed, at least in part, because the required deductions to net capital would have left the Inventory Account in a precarious net capital position. Indeed, as Terrance Yoshikawa testified, leaving the DDIX shares in the Inventory Account would have resulted in an "approximate $79,000 net capital hit ... [,] or even more with the undue [concentration deduction]."

All the evidence in the administrative record shows that the purchases between March 17 and March 19 took place both to help fund a $300,000 loan the IRA gave to Terrance Yoshikawa on March 18, and so that the Inventory Account's short position in DDIX could be covered. These purchases resulted in a profit to the IRA. As Terrance Yoshikawa stated in the 8/22/94 Letter, "[o]n [March 17], the market rose slightly.... [The March 17 transaction] allowed the IRA to realize a profit ... [and] allowed the Ko inventory to cover the majority of its short position at a minimal loss to the inventory account." He explains in his testimony that he had "left the inventory account short ... [because] [a]t that time I probably thought the stock was going to go down more, because they had nothing.... When it didn't go down, it went up instead, then I just ... bought the stock, I guess, and it went higher."

Terrance Yoshikawa testified that "[o]n [March 18], the market was stable." In the 8/22/94 Letter, Terrance Yoshikawa stated that the March 18 transaction "allowed the IRA to realize a profit ... [and] allowed the Ko inventory to cover most of the balance of its short position at a minimal loss to the inventory account." As noted, on March 18, the IRA lent Terrance Yoshikawa $300,000. These funds were deposited into the Trading Account to help meet the March 16 margin call.

In the 8/22/94 Letter, Terrance Yoshikawa states that "[o]n [March 19] the market continued to be stable ... Yoshikawa anticipated that [the market] might remain relatively stable at this level. [The March 19 transaction] allowed the IRA to realize a profit. By this transaction, the Ko inventory was in a long position." Terrance Yoshikawa notes in his Wells Submission that the March 19 transaction "helped [the] IRA after the withdrawal of the $300,000 check." In total, the IRA made a profit of $38,750 from these three sales to the Inventory Account.

(4)-(5): (4)—*On December 7, 1993, the Inventory Account sold 35,825 shares of DDIX to the IRA at a price of 4 ¼. (5)— On December 14, 1993, the Inventory Account purchased 20,000 shares of DDIX from the IRA at a price of 3. (4)—On December 15, 1993, the Inventory Account purchased 36,581 shares of DDIX from the IRA at a price of 2 ¾. (5)—On December 17, 1993, the Inventory Account sold 20,000 shares of DDIX to the IRA at a price of 3 ⅛.*

Following news that merger discussions had broken down between DDIX and International Bio Clinical, Inc., Yoshikawa feared that the price of DDIX stock would fall. The Inventory Account therefore sold DDIX to the IRA on December 7 at the market high. The purchases from the IRA on December 14 and December 15 were executed at the market low to help fund a $350,000 personal loan taken from the IRA on December 15. As Terrance Yoshikawa states in the 8/2/94 Letter, "[t]he shares were sold [from the IRA on December 14 and 15] to fund, in part, a $350,000 cash loan from Mr. Yoshikawa's IRA to himself personally." The IRA account lost approximately $54,000 on these two trades.

On December 17, the Inventory Account purchased 15,000 shares of DDIX on the open market from Instinet[8]; the Inventory Account then sold 20,000 shares of DDIX to the IRA account in anticipation of a market decline. As Terrance Yoshikawa states through his then-attorney in a December 12, 1994 letter, "because [Terrance Yoshikawa] had caused the Ko inventory to purchase 15,000 shares of [sic][I]nstinet . . . he determined that he had to reduce the risk in the Ko inventory account. In order to do so, Mr. Yoshikawa . . . sold the 20,000 shares of DDIX to his IRA."

 Element (1) of the definition of "parking"[9] is not present in Transaction Sets 2–5. There is no evidence in the administrative record of a prearrangement to sell and then repurchase securities at a specified time for Transaction Sets 2–5. In fact, the trades in Transaction Sets 2–5 did not appear to follow any particular pattern that would suggest a bad-faith buy-back scheme—they occurred anywhere between one and seven days apart in response to what the evidence shows was a volatile DDIX market.

There is scant evidence of the other definitional elements that would support a finding of "parking" for Transaction Sets 2–5. Definitional element (2) is not present, as none of the trades in Transaction Sets 2–5 took place on the same, or substantially the same, terms. The price differential between sale and repurchase in each transaction set varied from ⅜ to 4 ⅛ (an 11% to 58% spread). The Inventory Account lost money once, and gained three times. Each account appeared to bear a market risk with every executed trade.

Neither is definitional element (3) present in Transaction Sets 2–5. Any suggestion that bad faith was involved in Transaction Sets 2–5 is belied by the fact that all of the trades in Transaction Sets 2–5 were reported to NASDAQ and PaineWebber as required, were fully paid for with real funds, and were executed mid-month, well in advance of Yoshikawa's month-end net capital computation deadline. In addition, every trade in Transaction Sets 2–5 was executed at the actual market price then prevailing.

In its decision, the SEC makes reference to Terrance Yoshikawa's testimony that the DDIX market was illiquid and that a sale to the open market would likely

---

8. Instinet is a computer network through which professional investors effect block trades.

9. *See* supra Section IV.

have depressed its price.[10] The SEC relies on this testimony to suggest that Yoshikawa sold DDIX in the transactions at issue at an artificially high price. Record evidence clearly shows, however, that Yoshikawa traded DDIX on the open market on at least two occasions during the time periods at issue in this case, including even March 13, 1992, the day that the price was least stable.[11] Moreover, there is absolutely no evidence that any of these trades were not executed at the going market rate. Finally, even if the SEC were correct that the Inventory Account sold DDIX to Terrance Yoshikawa's own accounts at a price above market, this would not, in itself, constitute substantial evidence for a finding of *"parking"* (if anything, such a fact might support a finding of market manipulation or price fraud, neither of which were charged [12]).

■ In essence, the SEC's theory is that Yoshikawa "created a false and misleading picture of Ko's financial situation" by executing DDIX trades that allowed the Inventory Account to "avoid haircuts." However, there is no evidence that Yoshikawa was attempting, in any *impermissible* sense, to avoid a required haircut or other deduction to the Inventory Account's net capital computation. It is crucial to distinguish between the legitimate and illegitimate "avoidance" of a required haircut

through the sale of securities. An NASD firm legitimately "avoids" a haircut any time it sells stock in a bona fide transaction for the simple reason that the firm no longer owns the stock and is therefore no longer responsible for net capital deductions required in connection with owning it. In this sense, a firm "avoids" a required haircut in the same way that a personal property owner "avoids" paying excise taxes by transferring title to the property. There is nothing impermissible about such a practice. Thus, the fact that a firm avoids a required haircut through a securities transaction is an innocuous fact that does nothing, in itself, to demonstrate the existence of a "parking" scheme.

The avoidance of a required haircut only becomes illegitimate where it is accomplished by means of a sham trade or some form of "contrived transaction," *Whiteside*, 1988 WL 240333, at *2, designed simply to camouflage temporarily the true ownership of the stock. Accordingly, establishing that a required haircut was *impermissibly* "avoided" (i.e., showing that a firm circumvented a required haircut by "parking" securities) requires evidence that the trades at issue were executed in bad faith.

There is certainly evidence that, at least on one occasion, Yoshikawa considered the financial effect of required net capital deductions when deciding whether to sell

---

**10.** When asked why he would sell DDIX to his own accounts rather than to the market-at-large, Terrance Yoshikawa testified: "It's not a very good stock for trading volumes.... In the case of DDIX, I suppose that the stock would go down significantly" following a large sale.

**11.** On March 13, 1992, it was announced that DDIX had failed to gain FDA approval at phase III of it clinical study. In response to this news, the price of DDIX stock declined precipitously. As previously noted, on this day, the Inventory Account purchased 29,000 DDIX shares in 16 separate transactions from other market-makers, and sold 84,200 DDIX shares in 34 separate transactions to other market-makers.

**12.** We recognize that the NASD did allege, in its initial complaint, that Yoshikawa had committed a general "fraud" in violation of Arti-

cle III, Section 18 of the NASD Rules of Fair Practice (now Conduct Rule 2120). While we express no opinion on the merits of this charge, it is noteworthy that the NASD found that "Yoshikawa's intent in engaging in these transactions was not to defraud or deceive, but rather to preserve the capital of his firm.... [W]e believe that Yoshikawa did not intend to mislead the market." The NBBC, reviewing the NASD's decision, also held that "we do not believe that the evidence substantiates a finding of fraud against Ko and Yoshikawa." Nothing in the SEC's order addresses this allegation, save a single sentence in the closing paragraph noting that "the NASD found that applicants did not intend to deceive the NASD." We accordingly presume that the SEC also failed to find sufficient evidence of fraud.

DDIX out of the Inventory Account.[13] But this type of rational economic calculation is to be expected from any NASD firm that is leanly capitalized and must keep careful tabs on its net capital position. Making such strategic economic decisions about the net capital consequences of buying securities into, or selling securities out of, inventory simply does not evince a design to circumvent the net capital rules; if anything, it tends to demonstrate that care is being taken to follow those rules.

There is no evidence that Yoshikawa attempted impermissibly to avoid a required net capital deduction in Transaction Sets 2–5, or that Yoshikawa otherwise executed any of the trades in Transaction Sets 2–5 in bad faith. These trades appear no different than any other bona fide transactions that a firm might execute in response to a mercurial market.

## VI

The SEC held that Yoshikawa violated NASD Rules because "these trades were done to shift losses or anticipated losses out of the Inventory Account and to avoid haircuts that otherwise would have been required. Applicants' actions thereby alleviated actual or perceived problems for [Ko] with its net capital requirements...." To be sure, there is substantial evidence that, by executing the trades at issue in this case, Yoshikawa "shifted losses or anticipated losses out of the Inventory Account" and that Yoshikawa thereby "avoided haircuts" and "alleviated actual or perceived problems for [Ko] with its net capital requirements." In fact, Terrance Yoshikawa freely admits that he was "moving stock from the [Inventory Account] to [his] personal accounts in order to shift losses or attempt to make profits in [his] personal accounts." As should be clear, however, this only begs

the question whether "parking" occurred. Every time a sale is made in a falling market, a loss is "shifted" from one party to another, a haircut (if one was required) is "avoided" and net capital is protected. There is nothing dishonorable about such conduct; if there were, securities trading could never take place. As Yoshikawa states in his appellate brief,

> [i]f the court is to accept the Commission's interpretation ... that a parking violation can occur just because securities are sold to and from a firm's account mid-month without some other factor, then it follows that every time a firm sells its shares from its inventory account the firm runs the risk of committing a parking violation by reducing its security holding and subsequently reducing the need to report a haircut.

Securities transactions only become dishonorable (i.e., they only become "parking") where the trades are simply a sham used to conceal temporarily the true ownership of the securities and circumvent a required haircut, with the typical result that net capital is overstated. *See, e.g., Securities Investor Protection Corp. v. Vigman*, 74 F.3d 932, 933 n. 3 (9th Cir. 1996); *cf. United States v. Jones*, 900 F.2d 512, 515 (2nd Cir.1990) ("parking" involves the "purported transfer of ownership in securities combined with a secret [repurchase] agreement"). Put another way, Yoshikawa's conduct did not have "the effect of inflating [Ko's] net capital [or] misleading or potentially misleading [regulatory officials and PaineWebber] about the true state of Ko's finances" *unless* the trades were not actual, bona fide transactions just like any other in the marketplace. The simple fact that Terrance Yoshikawa executed these trades between his firm's account and his person-

---

**13.** The relevant testimony was as follows: when asked whether he knew, at the time he sold the 79,000 shares of DDIX to the Inventory Account from the Trading Account on March 16, that he would then resell 75,000 shares of DDIX to his IRA, Terrance Yoshika- wa testified "Yes. It would [have been] ... [an] approximate $79,000 net capital hit to leave it there [in the Inventory Account] at $3, about a third .... or even more with the undue [concentration] deduction that would have been required."

al accounts is irrelevant. Indeed, there is nothing illegitimate about such trades in themselves.[14] The relevant question, then, is whether substantial evidence supports the SEC's implicit finding that Yoshikawa's trades were not genuine, bona fide trades in which the economic consequences of ownership were meant to fall upon the buyer's account. The answer to this question is clear: with the single possible exception of Transaction Set 1, the administrative record is bereft of substantial evidence that these trades were anything but bona fide.

## VII

For Transaction Set 1, we remand this case to the SEC for further proceedings; in particular, the SEC is directed to determine if the securities trades executed between December 30, 1991 and January 2, 1992 independently support a factual finding of stock "parking" consistent with the definition established in this opinion. As for Transaction Sets 2–5, we reverse the SEC's finding that Yoshikawa engaged in securities "parking."

REMANDED IN PART AND REVERSED IN PART.

---

14. As explained by Jim Stone, a member of the NBCC that heard Yoshikawa's case, "there is no rule which would prohibit a principal of a firm from purchasing something out of the firm's inventory account."